**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**
**No. 93-7291**

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**versus**

**JOHNNY RODRIGUEZ,**

**Defendant-Appellant.**

_____

**Appeal from the United States District Court**
**for the Southern District of Texas**
_____

**(February 18, 1994)**

Before WISDOM, BARKSDALE, and EMILIO M. GARZA, Circuit Judges.

BARKSDALE, Circuit Judge:

Johnny Rodriguez appeals from his conviction and sentence, with the sentencing issue (the fine imposed) turning on the plain error rule, a rule which seems to receive inconsistent application. Doubtless, this will be righted by the Supreme Court's recent clarification of the rule in **_United States v. Olano_**, ___ U.S. ___, 113 S. Ct. 1770 (1993). We **AFFIRM**.

I.

At a border checkpoint, marijuana was found in a truck. At issue is whether Rodriguez was its driver. Following a jury trial, he was found guilty of possession with intent to distribute 120 kilograms of marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B). He was sentenced to 80 months of imprisonment, followed by five years of supervised release, and fined $1,000.

Rodriguez contends that the district court abused its discretion by denying a continuance; that the evidence was insufficient to sustain his conviction, because it was insufficient to prove that he was the driver of the truck in which the marijuana was found; and that the fine was improperly imposed.

A.

The first challenge is to the denial of Rodriguez's motion for trial continuance, in order to allow another attempt to serve a subpoena on alibi witness Primativo Vega, a professional truck driver from California. In his notice of alibi defense, Rodriguez asserted that he was not in the truck in which the marijuana was found; instead, that he was a passenger in a truck driven by Vega.

Rodriguez pleaded not guilty on December 1, 1992; trial was set promptly for January 7, 1993. Three days before that setting, Rodriguez moved for a continuance, asserting the need for additional investigation and time in which to locate defense witnesses. Trial was re-set for January 26.

But, pursuant to Rodriguez's January 22 motion for a definite trial setting and a three-week continuance in order to locate and subpoena potential witnesses, trial was re-set for February 17, 1993. And, his February 2 motions for issuance of subpoenas for Vega and five others were granted.

At a pretrial conference on February 16, defense counsel informed the court that the United States Marshals in California had failed in four attempts to serve Vega, and requested a

continuance of another week to attempt service. The court denied the motion, stating that the parties had been given a special trial setting, and that it did not appear that Vega had any interest in coming to court. That afternoon, Rodriguez filed a motion for continuance, asserting that the three witnesses for the alibi defense had not been served with subpoenas; the Government opposed the request.

The next day (the first day of trial), defense counsel informed the court that two of the three alibi witnesses were, or would be, present, but that Vega was a crucial, non-served alibi witness. Counsel proffered Vega's testimony. It was, in part: Rodriguez abandoned his truck at a truck stop in Edinburg, Texas, and obtained a ride with Vega and his co-driver through the Falfurrias checkpoint, an hour's drive to the north. At the checkpoint, they saw the truck (abandoned earlier that day by Rodriguez) in the secondary inspection area (where the marijuana was found). When Vega's co-driver opened Vega's trailer at the secondary inspection area, an individual named Jose Rangel, who had driven Rodriguez's truck from the truck stop to the checkpoint, asked to be allowed into Vega's truck. Vega gave Rodriguez a ride to Premont (ten miles beyond the checkpoint), and others gave him a ride from there to San Antonio.

Defense counsel admitted that, when he last talked to Vega, he (counsel) knew the original trial date (January 7), but did not give that information to Vega. Counsel also conceded that it was possible that Vega did not want to be found. The district court

- 3 -

denied a continuance, stating that, although Vega was "obviously a very important witness", Rodriguez had had ample time in which to secure his attendance, and there was no reason to believe that additional time would make any difference if Vega did not want to be found.

The denial of a continuance is reviewed only for abuse of discretion. *United States v. Botello*, 991 F.2d 189, 193 (5th Cir. 1993), *cert. denied*, ___ U.S. ___, 114 S. Ct. 886 (1994). And, if the continuance is sought because

> of the unavailability of a witness, the movant must show:
>
>> [that] due diligence has been exercised to obtain the attendance of the witness, that substantial favorable evidence would be tendered by the witness, that the witness is available and willing to testify, and that the denial of the continuance would materially prejudice the defendant.

*Id*. (quoting *United States v. Walker*, 621 F.2d 163, 168 (5th Cir. 1980), *cert. denied*, 450 U.S. 1000 (1981)).

Obviously, assuming that Vega's testimony would have been consistent with the proffer, it would have been "substantial favorable testimony", as the district court noted. But, Rodriguez failed to demonstrate due diligence in obtaining Vega's attendance. He listed Vega in his alibi notice on January 22; when the trial was concomitantly continued for the third time (all at Rodrigeuz's request in order to obtain witnesses), resulting in the February 17 setting, Rodriguez had nearly four weeks in which to secure Vega's attendance, yet he waited until two weeks before trial to request

- 4 -

the subpoena.  Moreover, he has not demonstrated that Vega would have been willing to give favorable testimony, and risk incriminating himself by testifying that, while giving Rodriguez a ride, he helped Rangel escape from arrest at the checkpoint.[1] *See Botello*, 991 F.2d at 193 (affirming the denial of continuance, partly because there was no reason to assume that the absent witness would be willing to incriminate himself by testifying).

In short, the district court did not abuse its discretion in denying Rodriguez's eve-of-trial motion for a third continuance.

## B.

Rodriguez contests his conviction, maintaining that there was insufficient evidence to prove that he was the driver of the truck in which marijuana was found when it was inspected at the checkpoint.[2]

---

[1]  After hearing all of the evidence, the district court commented that "the reason that ... Primativo Vega wasn't here is because it is likely that he is engaged in the commission of this crime as well, or at least an accessory after the fact".  And, after the verdict was announced, the court stated that it was "convinced that Primativo's absence was deliberate and he was not able to be found because he didn't want to be found, because it is apparent to the Court that Primativo was probably engaged at that time in the commission of the offense of accessory after the fact".

[2]  A conviction for possession of marijuana with the intent to distribute requires proof beyond a reasonable doubt that the defendant knowingly possessed marijuana with that intent. *E.g.*, *United States v. Gallo*, 927 F.2d 815, 821-22 (5th Cir. 1991). "Possession may be actual or constructive, may be joint among several defendants, and may be proved by circumstantial as well as direct evidence". *United States v. Vergara*, 687 F.2d 57, 61 (5th Cir. 1982).  "Constructive possession is defined as ownership, dominion or control over the contraband itself, or dominion or control over the premises or the vehicle in which the contraband was concealed". *United States v. Posner*, 868 F.2d 720, 722-23 (5th Cir. 1989) (internal quotation marks and citation omitted).  Intent to distribute may be inferred from the possession of a large

In reviewing a sufficiency of the evidence challenge, we examine the evidence in the light most favorable to the jury's verdict, making all reasonable inferences and credibility choices in favor of the verdict. *United States v. Montoya-Ortiz*, 7 F.3d 1171, 1173 (5th Cir. 1993). The evidence is sufficient if "a rational trier of fact could have found that [it] established guilt beyond a reasonable doubt". *Id.* (quoting *United States v. Gardea-Carrasco*, 830 F.2d 41, 43-44 (5th Cir. 1987)). "It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt.... A jury is free to choose among reasonable constructions of the evidence". *Id.* (quoting *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. 1982) (en banc), *aff'd*, 462 U.S. 356 (1983)). Although individual facts and incidents, considered separately, might be inconclusive, they "may, by their number and joint operation, especially when corroborated by moral coincidences, be sufficient to constitute conclusive proof". *United States v. Lechuga*, 888 F.2d 1472, 1476 (5th Cir. 1989) (internal quotation marks, brackets, and citation omitted).

Border Patrol agent Gill testified that he was stationed at the Falfurrias checkpoint on June 6, 1992, when a 1986 red Peterbilt truck arrived at 2:15 a.m. At trial, Gill identified

---

quantity of narcotics. *United States v. Martinez-Mercado*, 888 F.2d 1484, 1491 (5th Cir. 1989).

Although Rodriguez challenges his conviction, based on a sufficiency of evidence claim, the only avenue pursued is whether he was the driver. Accordingly, we need not consider the other elements of proof.

Rodriguez as the driver. Rodriguez told Gill that he was a United States citizen and was carrying a load of watermelons. While talking to Rodriguez, Gill noticed that he was nervous; that there was a heavy odor of cologne emanating from the cab of the truck, which Gill thought might be masking the smell of narcotics; and that the dates on the bill of lading had been altered. Gill referred the truck to the secondary inspection area.

Gill was using a flashlight at the primary inspection area and got "a fairly good look" at Rodriguez; got a "real good look" at the secondary inspection area, after Rodriguez opened the doors of the trailer, because Rodriguez was "right next to" him, standing only about a foot away; got another "real good look" when asking for permission to search the cab of the truck because, again, Rodriguez "was standing right next to" Gill; and, finally, got a similar good look at Rodriguez when he (Gill) was beginning to climb into the cab of the truck because, once again, Rodriguez "was standing right next to" him. Although it was dark, Gill had a powerful flashlight, light from light poles, and the lighting in the truck, which enabled him to observe Rodriguez. Nearly four months later, Gill viewed a photographic lineup and identified Rodriguez as the driver.

Rodriguez appeared nervous and his hands trembled when Gill asked for permission to search the cab, but he consented. Inside the cab, in the sleeper compartment behind the driver's seat, Gill found several bundles of marijuana, which weighed approximately 265

pounds. But, when he turned to arrest Rodriguez, he had disappeared.

Border Patrol agent Shaffer testified that the next vehicle to enter the checkpoint after the red truck was another 18-wheeler, driven by Vega; that Vega was extremely nervous; and that no one else was in the cab of his truck. Vega's truck was inspected by Shaffer and was also carrying watermelons, and the dates on the bill of lading also appeared to have been altered. Shaffer directed Vega to the secondary inspection area, and Vega pulled up alongside the red truck.

While Shaffer was inspecting Vega's trailer, Gill informed him that the driver of the red truck was missing. Shaffer told Vega to leave the checkpoint, and Vega jumped into the cab and "took off". Shaffer helped Gill search unsuccessfully for the driver of the red truck. Shaffer testified that the driver could not have left the checkpoint on foot unless he was extremely fast and ran down the highway 300-400 yards before anyone saw him missing -- a feat that Shaffer did not believe physically possible.

Truck broker David Zapata testified that Rodriguez worked for Garza Trucking Company in California; that he drove a red Peterbilt truck; and that he last saw Rodriguez in his (Zapata's) office around 11:00 a.m. on June 5, 1992. Rodriguez was accompanied by Vega. Zapata gave them orders to pick up watermelons, and gave Rodriguez $50 to repair a tire on his truck. Andy Lozano, a produce salesman, testified that he saw Rodriguez in a red truck at the Farmer's Market Service on June 5, at about 1:00 p.m., picking

up watermelons.  Zapata testified that Rodriguez telephoned him that afternoon, around 4:00 p.m., stating that his truck was being loaded and asking for advance money so that he could leave that evening.  Zapata advanced $250.

Jose Morales, who worked as a cashier at the 76 Truck Stop in Edinburg, testified that at 11:30 p.m. on June 5, he saw Rodriguez in the tire bay at the truck stop.  Around midnight, he saw Rodriguez driving away from the truck stop; he knew it was Rodriguez because he was about five yards away, the light was good, and they waved at each other.  (As noted, Edinburg is approximately an hour's drive south of the Falfurrias checkpoint.)

Vildo Garza, a truck driver, testified that he arrived at the 76 Truck Stop at approximately 11:30 p.m. on June 5.  He saw Rodriguez inside the store, and he (Rodriguez) asked Garza for a ride to San Antonio.  Rodriguez told him that there were two drivers for his (Rodriguez's) truck, and he (Garza) saw the other driver sitting in Rodriguez's truck while it was in the tire bay at the truck stop.  Garza told Rodriguez that he was not going to San Antonio, drank coffee with him, and left after midnight.  Jimmy Castro, another truck driver who worked for the same company as Garza, followed him from the truck stop to the Falfurrias checkpoint.

When Garza arrived at the checkpoint, he saw Rodriguez's truck, and another truck next to it, in the secondary inspection area.  Garza and Castro proceeded through the checkpoint and stopped at a cafe in Premont, about ten miles past the checkpoint.

As they were entering the cafe, another truck arrived; it appeared to be the same truck that had been stopped at the checkpoint beside Rodriguez's. Garza testified that Rodriguez was sitting in the cab of that truck, beside the driver. And, when he drove away from the cafe, Garza saw that Rodriguez had moved to Castro's truck.

A few weeks prior to trial, Garza spoke with Rodriguez. Garza testified that Rodriguez wanted him to talk to his (Rodriguez's) lawyer. When Garza asked Rodriguez, "Well, what's it about?", Rodriguez responded, "Well, about what happened down there". And, when Garza asked, "Well, how did you do it", Rodriguez replied, "I escaped".

Sally Garza, owner of the truck in which the marijuana was found, testified that she telephoned Rodriguez at his home in San Antonio on June 6; that Rodriguez told her that he had left the truck at the 76 Truck Stop because its personnel were rude to him and did not want to change a tire; and that he had obtained a ride to San Antonio with Vildo Garza.[3]

Rodriguez did not testify; he called two witnesses. David Zapata, the truck broker who testified as a prosecution witness, testified that Rodriguez told him that he abandoned the truck because he had an argument with the owner.

---

[3] Drug Enforcement Agency task force officer Will Bussey testified that on June 9, 1992, Sally and Ralph Garza of Garza Trucking Company showed him documents indicating that Rodriguez was the driver of the truck in which the marijuana had been found three days earlier; and that a driving log for Rodriguez was found in that truck. Vildo Garza is not related to Ralph or Sally Garza.

The other witness, truck driver Castro, referred to earlier by Vildo Garza, testified that he was at the 76 Truck Stop in Edinburg on June 5, and did not see Rodriguez there. He saw the red Peterbilt truck leave the truck stop, but could not see who was driving it, because the glass was tinted. He saw the driver of the red truck at the checkpoint, but did not recognize him; he did not see Rodriguez there.

Castro testified that when he came out of the cafe in Premont (past the checkpoint), where he had coffee with Garza, Rodriguez was sitting in his (Castro's) truck. Rodriguez was nervous, and stated that he had quit his job, had left the truck at the truck stop, and had obtained a ride from there to Premont with "Primativo" (Vega).[4] Castro gave Rodriguez a ride to San Antonio.

Noel Garcia, a tire repairman at the 76 Truck Stop, was called as a rebuttal witness for the Government. He testified that from 11:30 p.m. until midnight on June 5, he was working on a tire on the truck that Rodriguez was driving that day. He did not see anyone sitting inside the truck while it was in the tire bay. At 12:15 or 12:30 p.m., he observed that the truck had left; and he did not see it again.

This issue presents the quintessential jury question; no factor or basis is presented to take it outside that realm. It bears repeating that it is for the jury, not an appellate court, to make credibility choices, as well as to "choose among reasonable

---

[4] When asked if the name of the driver who gave Rodriguez a ride was "Primativo Vega", Castro responded: "Yes, sir. The last name I don't know, sir. Just Primativo."

constructions of the evidence".  Under our system of justice, the jury sits to hear the evidence and, based on that evidence and the court's charge, to render a verdict.  As is obvious from the above recitation of the evidence, "a rational jury" could easily find that Rodriguez drove the red truck into the checkpoint on June 6, 1992, and abandoned it there after Agent Gill discovered the marijuana.  In fact, in light of our properly restricted standard of review, Rodriguez's insufficiency claim borders on being frivolous.

### C.

Rodriguez contends that the district court improperly imposed a $1,000 fine "to help defray the cost of his [court-appointed] attorney".  It is to be paid during his 80 months imprisonment, with any balance to be paid during the first year of supervised release.  He raises three separate grounds: two are legal issues, concerning statutory and guideline authority *vel non*; and one concerns his being entitled to rely on the presentence report, which indicated that he had no present ability to pay the fine.[5]

A district court's finding on a defendant's ability to pay a fine is a factual one, subject to appellate review under the clearly erroneous standard.  *See, e.g.*, **United States v. Thomas**, ___ F.3d ___, ___, 1994 WL 13820, at *2 (5th Cir. 1994) (citing **United States v. Favorito**, 5 F.3d 1338 (9th Cir. 1993)).  And, "[a]pplication and interpretation of the guidelines are questions

---

[5] A defendant may rely on the PSR to establish his inability to pay a fine. **United States v. Fair**, 979 F.2d 1037, 1041 (5th Cir. 1992).

of law subject to plenary review".  *E.g., **United States v. Sosa***, 997 F.2d 1130, 1131-32 (5th Cir. 1993).

The PSR, in the paragraph entitled "Financial Condition: Ability to Pay", states:

> The defendant claims to have no assets nor liabilities....  The defendant is currently incarcerated and his wife and family are living off government assistance....  The defendant would, therefore, have an approximate net worth of $0.00 and an approximate annual income of $0.00.

The PSR earlier states, however, that Garcia, who was then 45 years of age, is in good health, has an eleventh-grade education, and has vocational skills as a truck driver, having so earned from $350 to $450 a week from 1978 until his incarceration.  Moreover, in the section entitled "Fines", it states that the maximum statutory fine is $2,000,000, and that the guideline fine range is $12,500 to $2,000,000.  But, it did not make a recommendation regarding a fine.[6]

Neither Rodriguez nor the Government objected to the PSR. More importantly for this case, when the district court imposed the fine at the sentencing hearing, Rodriguez did not object. Therefore, he seeks to challenge the fine for the first time on appeal.

---

[6]    In a separate Sentencing Recommendation, sealed pursuant to Fed. R. Crim. P. 32(c)(3), the probation officer recommended a $1,000 fine "to help defray costs involved in bringing this defendant before the Court and also for his jury trial".  We assume that this recommendation was not disclosed to the parties, pursuant to Fed. R. Crim. P. 32(c)(3)(A), which excludes "any final recommendation as to sentence" from the disclosure requirements.

As our court recently reiterated, "[w]e will allow sentences to be attacked on grounds raised for the first time on appeal in only the most exceptional cases. A party must raise a claim of error with the district court in such a manner so that the district court may correct itself and thus, obviate the need for our review." *United States v. Bullard*, ___ F.3d ___, ___, 1994 WL 18032, at *1 (5th Cir. 1994) (footnote omitted); *see also United States v. Garcia-Pillado*, 898 F.2d 36, 40 (5th Cir. 1990) ("the proper administration of justice, particularly our now severely strained criminal justice system, will be unduly hampered by any rule or practice which allows sentences to be attacked on grounds raised for the first time on appeal in any but the most exceptional cases").

In other words, we will review this belated challenge "only for plain error".[7] *United States v. Brunson*, 915 F.2d 942, 944 (5th Cir. 1990); *see also United States v. Gross*, 979 F.2d 1048, 1052 (5th Cir. 1992) ("If a defendant fails to object to his sentence, this court will reverse his sentence only upon a finding of plain error".); *United States v. Navejar*, 963 F.2d 732, 734 (5th Cir. 1992) ("Navejar did not object to these alleged errors during

---

[7]    Rodriguez did not file a reply brief in response to the Government's brief, which urged the plain error standard of review. At oral argument, his counsel asserted that the issue should be reviewed *de novo*. Needless to say, a reply brief containing such an assertion, with supporting authorities, should have been filed. Although a reply brief is not mandatory, see Fed. R. App. P. 28(c), it is the best vehicle for narrowing the true issues, and is especially important -- and called for -- when a new point or issue (such as application of the narrow plain error standard of review) is raised in the appellee's brief.

the sentencing hearing and, accordingly, he may not raise this objection for the first time on appeal absent plain error".); *United States v. Matovsky*, 935 F.2d 719, 722 (5th Cir. 1991) ("Where the presentence report makes no recommendation concerning the fine, and the defendant neither presents evidence on nor objects to the amount of the fine assessed within the guideline range, the defendant may not raise new objections in this court absent plain error.").

Federal Rule of Criminal Procedure 52(b) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court". Fed. R. Crim. P. 52(b). The Supreme Court recently clarified an appellate court's "limited power [under Rule 52(b)] to correct errors that were forfeited because not timely raised in the District Court." *United States v. Olano*, ___ U.S. ___, 113 S. Ct. 1770, 1776 (1993). Four factors come into play.

First, there must be an "error". *Id.* at 1777. "Deviation from a legal rule is `error' unless the rule has been waived". *Id*.

Second, the error must be "plain". *Id*. "`Plain' is synonymous with `clear' or, equivalently, `obvious'". *Id*.

Third, the error must "affec[t] substantial rights". *Id*. at 1777-78 (internal quotation marks omitted). "Normally, although perhaps not in every case, the defendant must make a specific

showing of prejudice to satisfy the `affecting substantial rights' prong of Rule 52(b)". *Id*. at 1778.[8]

The final, and fourth factor, concerns the appellate court's discretion. Although plain error has been defined in various ways,[9] "the ultimate decision whether or not to take notice of an

---

[8]    In *Olano*, the Court noted the burden of persuasion shift between showing "plain error" under Rule 52(b), as opposed to "harmless error" under Rule 52(a):

> When the defendant has made a timely objection to an error and Rule 52(a) applies, the Court of Appeals normally engages in a specific analysis of the District Court record -- a so-called "harmless error" inquiry -- to determine whether the error was prejudicial.  Rule 52(b) normally requires the same kind of inquiry, with one important difference: It is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice.  In most cases, the Court of Appeals cannot correct the forfeited error unless the defendant shows that the error was prejudicial.... This burden-shifting is dictated by a subtle but important difference in language between the two parts of Rule 52: while Rule 52(a) precludes error-correction only if the error "does *not* affect substantial rights" (emphasis added), Rule 52(b) authorizes no remedy unless the error *does* "affec[t] substantial rights."

*United States v. Olano*, ___ U.S. ___, 113 S. Ct. at 1778.  *Olano* was handed down four days after sentencing in this case.  As discussed *infra*, Rodriguez has not made the requisite showing of prejudice; he has not even attempted to.

[9]    *See, e.g.*, *United States v. Frady*, 456 U.S. 152, 163 (1982) ("error so `plain' the trial judge and prosecutor were derelict in countenancing it, even absent the defendant's timely assistance in detecting it"); *United States v. Martinez-Cortez*, 988 F.2d 1408, 1411 (5th Cir.) ("a mistake so fundamental that it constitutes a `miscarriage of justice'"), *cert. denied*, ___ U.S. ___, 114 S. Ct. 605 (1993); *United States v. Lopez*, 923 F.2d 47, 50 (5th Cir.) (citations omitted) ("plain error occurs where our failure to consider the question results in `manifest injustice'"), *cert. denied*, ___ U.S. ___, 111 S. Ct. 2032 (1991); *United States v. Thetford*, 676 F.2d 170, 180 n.19 (5th Cir. 1982), *cert. denied*, 459 U.S. 1148 (1983) ("Plain error exists only if it affects

- 16 -

error not raised below must depend on the facts of the particular case". **United States v. Morales**, 477 F.2d 1309, 1315 (5th Cir. 1973) (footnote omitted). "The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases". **Singleton v. Wulff**, 428 U.S. 106, 120 (1976). In **Olano**, the Supreme Court reaffirmed this principle:

> Rule 52(b) is permissive, not mandatory. If the forfeited error is "plain" and "affect[s] substantial rights," the Court of Appeals has authority to order correction, but is not required to do so. The language of the Rule ("may be noticed"), the nature of the forfeiture, and the established appellate practice that Congress intended to continue, all point to this conclusion.

**United States v. Olano**, ___ U.S. ___, 113 S. Ct. at 1778. **Olano** provides that "the standard that should guide the exercise of [our] remedial discretion under Rule 52(b)" is the oft-quoted one articulated in **United States v. Atkinson**, 297 U.S. 157 (1936):

> The Court of Appeals should correct a plain forfeited error affecting substantial rights if the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings."

---

substantial rights of a party so basic that the infraction can never be treated as harmless error"), *cert. denied*, 459 U.S. 1148 (1983); **United States v. Gerald**, 624 F.2d 1291, 1299 (5th Cir. 1980) ("[p]lain error is error which is `both obvious and substantial'"), *cert. denied*, 450 U.S. 920 (1981); **United States v. Jacquillon**, 469 F.2d 380, 386 (5th Cir. 1972) (application of the plain-error rule "is limited to exceptional situations involving serious deficiencies which affect the fairness, integrity, or public reputation of the judicial proceedings"), *cert. denied*, 410 U.S. 938 (1973); **United States v. Flanagan**, 445 F.2d 263, 265 (5th Cir. 1971) ("so palpably flagrant as to affect ... substantial rights"), *cert. denied*, 404 U.S. 1060 (1972).

*United States v. Olano*, 113 S. Ct. at 1779 (quoting *Atkinson*, 297

U.S. at 160).[10]  The Court concluded:

> An error may "seriously affect the fairness, integrity or public reputation of judicial proceedings" independent of the defendant's innocence.  Conversely, a plain error affecting substantial rights does not, without more, satisfy the *Atkinson* standard, for otherwise the discretion afforded by Rule 52(b) would be illusory.

*Id.*

Guided by that standard, we decline to exercise our discretion

to review Rodriguez's challenge to the fine.  Even assuming an

"error" that is "plain", he has not shown that his "substantial

rights" have been "affect[ed]".  Moreover, the "fairness, integrity

or public reputation of judicial proceedings" are not implicated by

---

[10]    Some of our pre-*Olano* cases seem to imply that factual issues are not subject to review under the plain error standard. *See, e.g.*, *United States v. Garcia-Pillado*, 898 F.2d at 39 (emphasis added) (quoting *Self v. Blackburn*, 751 F.2d 789, 793 (5th Cir. 1985)) ("issues raised for the first time on appeal `are not reviewable by this court unless they involve purely legal questions *and* failure to consider them would result in manifest injustice'"). Others imply that a factual issue may be reviewed for plain error, but only if the failure to consider it would constitute a miscarriage of justice. *See, e.g.*, *United States v. Lopez*, 923 F.2d at 50 (emphasis added) ("when a new *factual* or legal issue is raised for the first time on appeal, plain error occurs where our failure to consider the question results in `manifest injustice'"); *Atlantic Mut. Ins. Co. v. Truck Ins. Exch.*, 797 F.2d 1288, 1293 (5th Cir. 1986) (emphasis added) ("An issue raised for the first time on appeal generally is not considered unless it involves a purely legal question *or* failure to consider it would result in a miscarriage of justice").  In *Lopez*, our court stated that "[q]uestions of fact capable of resolution by the district court upon proper objection at sentencing can never constitute plain error", and that "[f]or a fact issue to be properly asserted, it must be one arising outside of the district court's power to resolve".  923 F.2d at 50.  We need not resolve this apparent conflict, including with *Olano*, in light of our decision to exercise our discretion to decline to review Rodriguez's challenge to the fine.

the imposition of a $1,000 fine -- a downward departure from the range of $12,500 to $2,000,000 -- payable over a period of 92 months (80 months in prison and 12 months on supervised release), upon a defendant who is in good health and has earned $350 to $450 weekly as a truck driver for nearly 14 years prior to his incarceration for the instant offense. Needless to say, our decision to not review the issue will not result in a miscarriage of justice.[11]

As stated at the start of this discussion, one of the obvious, and most salutary, purposes of the plain error rule "is to enforce the requirement that parties object to errors at trial in a timely manner so as to provide the trial judge an opportunity to avoid or correct any error, and thus avoid the costs of reversal". *United States v. Chaney*, 662 F.2d 1148, 1151 n.4 (5th Cir. 1981).[12] Although there was no reason for Rodriguez to file objections to the PSR, inasmuch as it neither recommended a fine nor contained

---

[11]    *See United States v. Altamirano*, 11 F.3d 52, 53 (5th Cir. 1993) (emphasis added) (citing U.S.S.G. § 5E1.2(a) (Nov. 1992)) (the Guidelines require a fine "unless the defendant establishes that he cannot pay *and is not likely to become able to pay*"); *id*. ("Neither the Constitution, nor applicable sentencing statutes and guidelines ... categorically prohibit a court from ever imposing a fine after the defendant has proven his inability to pay"); *United States v. Voda*, 994 F.2d 149, 154 n.13 (5th Cir. 1993) (same). *See also id*. at 155 n.14 (fine may be based on defendant's future ability to pay); *United States v. O'Banion*, 943 F.2d 1422, 1432 n.11 (5th Cir. 1991) (same); *United States v. Matovsky*, 935 F.2d at 722-23 (same).

[12]    *See also United States v. Vontsteen*, 950 F.2d 1086, 1090 (5th Cir.) (en banc), *cert. denied*, ___ U.S. ___, 112 S. Ct. 3039 (1992) (quoting Wayne R. LaFave and Jerold H. Israel, 3 *Criminal Procedure* § 26.5 at 251-52 (West 1984) (footnote omitted)) (discussing "many rationales for the raise-or-waive rule").

information reflecting that he had the present ability to pay one, there was no reason why he could not have objected when the fine was imposed at the sentencing hearing. "Despite ample opportunity to raise this matter below and to express any dissatisfaction [he] might have with the sentence, [Rodriguez] did neither". *See* **United States v. Garcia-Pillado**, 898 F.2d at 39. He did not give any indication of his dissatisfaction until he filed his appellate brief. If it were so critical that Rodriguez not be fined, surely something would have been said about it at sentencing. "There is no reason whatever for [Rodriguez] to have failed to call this matter to the district court's attention while that court still had the case under its jurisdiction or to then express [his] dissatisfaction with the sentence". **Id**.

## III.

For the foregoing reasons, the conviction and sentence are

**AFFIRMED**.