UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
No. 93-8548

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MICHAEL McCORD and
O. B. HALEY, SR.,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Western District of Texas
(DR-92-CR-78(1))
_____

(September 26, 1994)

Before POLITZ, Chief Judge, and DUHÉ and BARKSDALE, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

This appeal principally concerns the convictions of Michael McCord and O. B. Haley, in connection with their roles as trustees in funding a bank employee stock ownership plan, for conspiracy to violate 18 U.S.C. § 1954 (proscribing improper payments to persons, such as trustees, who influence such plans), to include whether they satisfied § 1954's "bona fide compensation" exception to criminal liability. McCord also contests his five other bank-related convictions and challenges his sentence on several grounds. We **REVERSE** McCord's money laundering conviction and **REMAND** his case for resentencing; otherwise, we **AFFIRM**.

I.

In April 1993, as a result of their activities at the American Bank of Commerce (ABC) in Del Rio, Texas, McCord and Haley were convicted for conspiring to violate § 1954, by agreeing that Haley, through his corporation, would give McCord shares of ABC stock because of McCord's actions and decisions as a trustee of the ABC employee stock ownership plan (ESOP), in violation of 18 U.S.C. § 371 (count one). Each was acquitted of a substantive violation of § 1954 (counts two and three).

As for the several other related charges against McCord (to include one against his wife), he was acquitted of soliciting kickbacks, in violation of 18 U.S.C. § 215(a)(2) (count seven, which charged that he demanded a $5,000 finder's fee from two ABC customers to secure a buyer for their property); but he was convicted for filing a false tax return by failing to report the gain from sales of the stock received from Haley's corporation, in violation of 26 U.S.C. § 7206(1) (count four).[1] Furthermore, as a result of having ABC pay for the installation of a new air conditioner at his home and the installation of his used unit at a house owned by ABC, McCord was convicted for making, or causing to be made, false entries on bank records, in violation of 18 U.S.C. §§ 2 and 1005 (count five), and misapplication of bank funds, in violation of 18 U.S.C. §§ 2 and 656 (count six). Concerning a loan made by ABC to his brother-in-law, McCord was convicted both for

---

[1] McCord's wife was acquitted on the tax count, the only one in which she was charged.

unlawfully receiving part of the proceeds, in violation of 18 U.S.C. § 1005 (count eight), and for money laundering for the deposit of the proceeds he received, in violation of 18 U.S.C. § 1957 (count nine).

Haley was sentenced, *inter alia*, to five months imprisonment, with a recommendation that it be served at a halfway house. McCord was sentenced, *inter alia*, to 36 months imprisonment on the tax count and 37 months on each of the other five counts of conviction, all to be served concurrently, and ordered, *inter alia*, to pay $2,950 restitution (amount of the air conditioner invoice), and to forfeit $17,000 (proceeds received from the loan to his brother-in-law).

## II.

Haley challenges the denials of his motions for severance and to dismiss the indictment, the jury charge, and the sufficiency of the evidence to support his conviction. McCord contests the jury instructions, sufficiency of the evidence, the money laundering conviction (on constitutional grounds), and his sentence (on four bases).

The bulk of the numerous contentions concern the sufficiency of the evidence. The following analysis of the evidence, and the proper inferences that can be drawn from it, required in order to review the sufficiency challenges, amply demonstrates, once again, why our standard of review for such challenges is so narrow. For numerous, and most obvious reasons, we do not sit to retry the charges against Haley and McCord; that is the function of the jury.

A.

It is the jury's "unique role" to judge the credibility and evaluate the demeanor of witnesses and to decide how much weight should be given to their testimony. *E.g.*, **United States v. Higdon**, 832 F.3d 312, 315 (5th Cir. 1987), *cert. denied*, 484 U.S. 1075 (1988). Our resulting narrow standard of review for sufficiency of the evidence challenges "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts". **Jackson v. Virginia**, 443 U.S. 307, 319 (1979).

Accordingly, McCord and Haley's sufficiency of the evidence challenges fail if a rational trier of fact could have found that the Government proved the essential elements of the crime charged beyond a reasonable doubt. **United States v. Webster**, 960 F.2d 1301, 1307-08 (5th Cir.), *cert. denied*, ___ U.S. ___, 113 S. Ct. 355 (1992). Toward that end, "[w]e must view the evidence in the light most favorable to the verdict, accepting all credibility choices and reasonable inferences made by the jury". **United States v. Gardea-Carrasco**, 830 F.2d 41, 43 (5th Cir. 1987) (footnote omitted). Moreover, "[i]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt .... A jury is free to choose among reasonable constructions of the evidence". **United States v. Bell**, 678 F.2d 547, 549 (5th Cir. 1982), *aff'd*, 462 U.S. 356 (1983). Finally, "our review remains

- 4 -

the same whether the evidence is direct or circumstantial". *United States v. Cardenas*, 9 F.3d 1139, 1156 (5th Cir. 1993), *cert. denied*, 114 S. Ct. 2150 (1994).

For a conspiracy in violation of 18 U.S.C. § 371, the Government must prove "that the defendant entered into an agreement with at least one other person to commit a crime against the United States and that *any one* of these conspirators committed an overt act in furtherance of that agreement". *United States v. Chaney*, 964 F.2d 437, 449 (5th Cir. 1992) (emphasis in original). "The government must also prove that the defendant knew of the conspiracy and voluntarily became part of it". *Id*. Haley and McCord were charged with conspiring to violate § 1954, which provides in pertinent part:

> Whoever being--
>
> > (1) [a] ... trustee ... of any employee ... benefit plan; or
> >
> > (2) an officer ... of an employer ... whose employees are covered by such plan; or
> >
> > ....
> >
> > (4) a person who, or an officer ... of an organization which provides benefit plan services to such plan
>
> receives or agrees to receive or solicits any fee, kickback, commission, gift, loan, money, or thing of value because of or with intent to be influenced with respect to, any of his actions, decisions, or other duties relating to any question or matter concerning such plan or any person who directly or indirectly gives or offers, or promises to give or offer, any fee, kickback, commission, gift, loan, money, or thing of value prohibited by this section, shall be fined not more than $10,000 or imprisoned not more than three years, or both: *Provided*, That this section shall not prohibit the

- 5 -

> payment to or acceptance by any person of bona fide salary, compensation, or other payments made for ... services actually performed in the regular course of his duties as such ... officer, trustee, ... or employee of such plan, employer, ... or organization providing benefit plan services to such plan.

18 U.S.C. § 1954 (emphasis in original).

Haley and McCord contend that the Government failed to prove, as required by § 1954, that stock was transferred by Haley to McCord "because of" McCord's actions or decisions as an ESOP trustee; and that the section's bona fide compensation exception is applicable.[2]  The facts underlying the charged conspiracy are as

---

[2]     McCord and Haley claim also that "Wharton's Rule" prohibits their conspiracy convictions because they were the only two named co-conspirators and were acquitted of substantive violations of § 1954, the only object of the conspiracy.  "Wharton's Rule states that `[a]n agreement by two persons to commit a particular crime cannot be prosecuted as a conspiracy when the crime is of such a nature as to necessarily require the participation of two persons for its commission'".  **United States v. Brown**, 7 F.3d 1155, 1162 n.6 (5th Cir. 1993) (quoting 1 R. Anderson, **Wharton's Criminal Law and Procedure**, § 89, at 191 (1957)).  Wharton's Rule applies only when "it is *impossible under any circumstances* to commit the substantive offense without cooperative action".  **Id.** at 1163 (internal quotation marks and citation omitted; emphasis in original).

Because this issue is being raised for the first time on appeal, we review it only for plain error.  **United States v. Rodriguez**, 15 F.3d 408, 414-17 (5th Cir. 1994).  There is none; even assuming that McCord and Haley satisfy the first step in plain error analysis, that there was an error, that error is not "plain" ("clear" or "obvious").  **Id.** at 415.  In short, it is most questionable whether the rule applies to § 1954, in the light of, *inter alia*, the section's legislative history reflecting that the purpose of § 1954 was to protect plan participants and their dependents, interstate commerce, and the national public interest.  *See* 1962 U.S.C.C.A.N. 1532, 1532-39, 1549.  *See* **Iannelli v. United States**, 420 U.S. 770, 784 (1975) ("[u]nlike the consequences of the classic Wharton's Rule offenses, the harm attendant upon the commission of the substantive offense [proscribed by § 1954] is not restricted to the parties to the agreement.")  Accordingly, because the error (assumed) is not plain, we need proceed no further in our

follows.  (Haley did not testify; McCord did.)

During the early 1980s, McCord and Haley worked together at Red Bird Bank in Dallas.  In 1985, several ABC directors asked Haley to invest in ABC, which had been operating under a cease and desist order since 1984.  Haley did so, was elected chairman of ABC's board, and brought in McCord as executive vice president.  McCord became president in April 1986; and that December, ABC raised $362,761 through a public stock offering.[3]  By 1987, it had become profitable.

In June 1987, Red Bird Bank loaned $78,040 to the corporation owned by Haley, Leisure Valley, Inc.  The loan was secured by 80,000 shares of ABC stock and personally guaranteed not only by Haley, but also by McCord.[4]  That December, the loan was renewed for a year, with the amount increased to $162,040.  It was secured by 175,000 ABC shares and again personally guaranteed by Haley and McCord.

In late 1987 or early 1988, after McCord attended a seminar at which Banking Consultants of America (BCA) made a presentation about employee stock ownership plans (ESOPs),[5] he and Haley decided

---

analysis.

[3]    At $1.00 per share, 362,761 were sold; McCord purchased 40,000.

[4]    Neither side advances why McCord personally guaranteed the loan to Haley's corporation, nor is there any explanation in the record.

[5]    Charles Bullock, a tax lawyer who had been employed by BCA, testified that an ESOP is a retirement plan, much like a profit-sharing plan, except that it invests primarily in employer securities; and that an ESOP can be used for the purposes of

- 7 -

to establish one at ABC; and McCord retained BCA in July 1988 to do so.[6] BCA advised ABC that the ESOP could not pay more than fair market value for stock; and as it recommended, ABC retained an independent appraiser. An appraisal was necessary because there was no active market for ABC stock. The stock was appraised at $2.35 per share as of July 1, 1988.

Prior to September 20, 1988, Haley owned 170,000 shares of ABC stock; his corporation, Leisure Valley, 174,000; and McCord, 105,000.[7] On September 20, Leisure Valley transferred 70,194 shares to McCord -- 34,477 by one certificate and 35,717 by another. McCord claims that he paid $81,020 for the 34,477 shares (at the $2.35 appraised value), but received the 35,717 shares as a gift from Haley for making ABC profitable. On the other hand, Haley maintains that, as a reward for McCord's work, he sold McCord all 70,194 shares at a discount for $80,723.10 ($1.15 per share).[8]

_____

employee motivation, retirement benefits, raising capital as a takeover defense, and creating a market for stock. An ESOP is created by resolution of the sponsoring employer's board of directors, and the ESOP's trustees are responsible for its operations. In an ESOP, a trust owns shares of the employer's stock for the benefit of the employees. The stock is contributed to the plan at no cost to the employees, and ESOPs may acquire stock by purchasing it from either the sponsoring employer or shareholders.

[6] McCord testified that attracting good people to work for ABC was difficult; that once he had trained employees, he lost them to other banks; and that the ESOP was to motivate employees and give them an incentive to stay with ABC.

[7] There were approximately 815,000 shares of ABC stock issued, with approximately 150 shareholders.

[8] In a pre-indictment interview, Haley stated that he sold the stock at a discount because he wanted to recognize McCord's hard work and success at ABC. And, on its income tax return, Leisure

The ESOP trust agreement was executed ten days later -- September 30, 1988. That same day, McCord and Haley, as trustees of the ESOP, borrowed $162,040 from Red Bird Bank on behalf of the ESOP, so that it could purchase stock.[9] As required by law, the loan was non-recourse; for collateral, Red Bird Bank could look only to the stock purchased by the ESOP. Red Bird Bank required McCord and Haley to pledge their remaining ABC stock and to personally guarantee the ESOP loan.[10]

Eleven days later (October 11), McCord sold to the ESOP 34,477 shares of the ABC stock he had received on September 20. The sale was at the appraised value of $2.35 per share; $81,020 was paid. (As discussed, this equals the amount paid by McCord to Haley's corporation.) The ESOP also purchased the same number of shares of ABC stock (34,477) from Leisure Valley for $81,020 (appraised value).[11] That same day, in payment for the stock transferred to

_____

Valley reported the entire transfer to McCord as a sale. At $1.15 per share, 70,194 would cost $80,723.10; but, 34,477 at $2.35 per share totals $81,020.95 (the amount McCord paid). Although the Government's witnesses, who reviewed the pertinent records, agreed with Haley's position, the Government does not explain why McCord paid $81,020, rather than $80,723.10.

[9] Bullock testified that in a significant number of ESOPs the stock is purchased with borrowed funds.

[10] Red Bird Bank was eligible for a 50% tax exemption on the interest it earned on the ESOP loan.

[11] McCord testified that, originally, the ESOP was going to purchase the stock only from Haley; that Haley asked him if he wanted to sell some of his shares, but he was not interested because he felt that the stock was appreciating and was looking to it as a retirement plan; and that, because Haley wanted the bank employees to believe that the ESOP stock was coming from both of them and did not want to usurp McCord's authority by being the only contributor of shares to the ESOP, Haley asked McCord to buy the

- 9 -

him on September 20 by Haley's corporation, McCord deposited in the account of that corporation, Leisure Valley, his $81,020 from his sale to the ESOP. In turn, Leisure Valley used the proceeds from the two sales to the ESOP (its and McCord's) to pay off Leisure Valley's December 1987 $162,040 loan from Red Bird Bank, which was to become due that December, and had been personally guaranteed by Haley and McCord.

In August 1990, the Office of the Comptroller of the Currency declared ABC insolvent, after requiring it to accept liability for the ESOP loan and to charge off other loans.[12]

## 1.

"Under § 1954, a defendant may be convicted of receiving a [thing of value] (a) `because of' *or* (b) `with intent to be influenced with respect to' any actions or decisions relating to the plan involved". **United States v. Pieper**, 854 F.2d 1020, 1024 (7th Cir. 1988) (emphasis in original). The Government proceeded under the "because of" prong. "[I]t is not necessary that a defendant have had actual ability to control investment decisions of a [plan] so long as, because of his status, he had ostensible power over decisions regarding the [plan]". **Id**. at 1025. As noted, Haley and McCord contend that the Government failed to prove that they conspired to transfer ABC stock to McCord "because of" his position as an ESOP trustee; that, instead, the stock was a

---

stock from him and then sell it to the ESOP.

[12]    It appears that ABC was required to accept liability for the ESOP loan because of ABC's monthly $3,000 payments to the ESOP for its use to pay the note.

- 10 -

reward for McCord's work at ABC, an entity separate from the ESOP. In support, they note that the ESOP was not created until after the transfer.

There is sufficient evidence that McCord and Haley agreed to transfer ABC stock to McCord "because of" his authority as an ESOP trustee to decide how, and from whom, the ESOP would acquire stock. They decided to establish an ESOP, the only type of employee benefit plan which allows trustees to sell their shares to the plan,[13] rejecting other types of benefit plans.[14]  They elected to serve as trustees and, as such, had authority to decide how much stock the ESOP would purchase and from whom.  Although no specific amount of stock was required to fund the ESOP, McCord and Haley decided that it would purchase 68,954 shares at $2.35 per share, for a total of approximately $162,040[15] -- the amount of Leisure Valley's (Haley's corporation) note at Red Bird Bank, which they

---

[13]     The ESOP trust agreement gave the trustees power to enter into transactions between themselves, as trustees, and the bank, or any bank shareholder, for the purpose of acquiring or selling bank stock.  Government witnesses testified that it is not unusual, at small, independent banks such as ABC, for bank officers to serve as ESOP trustees, and that it is not unusual for ESOP trustees to sell their stock to the ESOP.  An attorney employed by BCA testified that ERISA establishes two standards that apply when a "party in interest" sells stock to an ESOP:  (1) the party in interest can be paid no more than adequate consideration for the stock, which is generally the appraised fair market value; and (2) no one can earn a commission on the sale.  He testified further that, if those two requirements are satisfied, there is nothing wrong with a trustee, who also happens to be a major shareholder, officer, or director of the bank, selling stock to an ESOP.

[14]     McCord testified that they rejected a 401K or a profit sharing plan because they wanted to give the employees a vested interest in the growth and performance of the bank.

[15]     At $2.35 per share, 68,954 totals $162,041.90.

- 11 -

had personally guaranteed, and which was to become due approximately three months later, in December 1988. Indeed, the proceeds from the sales to the ESOP were used to pay off that loan.

Although Leisure Valley could have sold all 68,954 shares to the ESOP, it instead sold only 34,477, transferring approximately 70,200 shares to McCord, who then sold to the ESOP approximately half of those shares (the same amount as sold to the ESOP by Leisure Valley). The Government introduced evidence that the ESOP could have been funded with ABC treasury stock. In addition, other shareholders owned stock which could have been purchased by the ESOP, but Haley and McCord did not give them an opportunity to sell their shares to it.[16] Although the Government's witnesses testified that there was no formal requirement that other shareholders be notified of the ESOP's plans to purchase stock, BCA's president testified that it would have been prudent for McCord and Haley to notify the majority shareholders. It is true that McCord and Haley sold their stock to the ESOP at the appraised value; but that price

---

[16] Tully Shahan, one of the founding directors of ABC, testified that, in 1988, or 1989, he talked to McCord about selling his 22,000 shares of ABC stock to ABC. McCord told him that ABC might be interested in buying the stock at $1.25 per share, and did not mention the July 1988 appraisal of $2.35 per share. Tom Schneider, another founding director of ABC, testified that he owned 135,000 shares of ABC stock in 1988, but was not given an opportunity to sell his stock to the ESOP.

Although both Shahan and Schneider testified that they would not have been willing to sell their stock to the ESOP at $2.35 per share if they had been required to guarantee the ESOP's $162,040 loan from Red Bird Bank, the director for the United States Department of Labor Pension and Welfare Benefits Administration in the Dallas region testified that there is no requirement that persons who sell stock to an ESOP must guarantee any note in connection with that transaction.

was the maximum, or ceiling, that the ESOP could pay.  There was nothing to prevent the ESOP from purchasing shares from other shareholders for less than the appraised price, had there been willing sellers.[17]

The evidence strongly supports the inference that McCord and Haley chose not to notify the other shareholders because they had decided that the ESOP would purchase stock only from them, at the appraised value.  They benefited from the sales, inasmuch as there was not an active market for the stock, and the proceeds were used to pay off Leisure Valley's note at Red Bird Bank, which they had personally guaranteed.  (Although they also personally guaranteed the ESOP loan from Red Bird Bank, they anticipated that the loan would be paid by ABC's contributions to the ESOP.  As noted, it contributed $3,000 per month to the ESOP for that purpose.[18])

The timing of the stock transfer also supports an inference that it was "because of" McCord's authority as an ESOP trustee to decide from whom the ESOP would purchase stock.  McCord joined ABC in 1985, and he testified that it had become profitable by 1987; yet Haley waited until September 20, 1988 -- ten days before the ESOP was established -- to transfer the stock to McCord, ostensibly

[17]    Bullock testified that the biggest abuse of an ESOP is selling stock to it at an inflated price.

[18]    Bullock testified that when an ESOP borrows money, the loan is repaid through contributions to the trust from the sponsoring employer.  McLeod, a tax lawyer and certified public accountant with BCA, who drafted the documents for the ESOP loan, testified that the only source of funds to repay the ESOP loan is contributions from the sponsoring employer, and that the lender relies on the employer to make contributions to the ESOP to enable payment of the loan.

to reward his past services in making ABC profitable.  At the same time, McCord sold 34,477 of the shares to the ESOP at the appraised price.[19]

That the transfer occurred before the ESOP was formally established (by ten days) is insignificant in light of the fact that McCord and Haley exercised control over the ESOP at least as early as July 1988, when ABC retained BCA.[20]  Although the ESOP trust agreement was not signed until September 30, 1988, ABC's board adopted a resolution making the ESOP effective January 1, 1988.  Moreover, McCord testified that, prior to the signing of the ESOP documents, it had been agreed who the trustees would be, where the funding would come from, and how many shares the ESOP would purchase.

In sum, the evidence supports the jury finding that Haley and McCord agreed that Haley, through Leisure Valley, would transfer ABC stock to McCord "because of" his position as an ESOP trustee, including his authority to make decisions about the manner in which the ESOP was funded.  Accordingly, the standard for affirming the jury's verdict is met: a rational trier of fact could have found

_____

[19]   As stated, McCord claims that he paid the appraised value of $2.35 per share for the 34,477 shares, and received the 35,717 shares as a gift from Haley for his efforts in making ABC profitable; Haley, that he rewarded McCord by selling him all 70,194 shares for only $1.15 per share.

[20]   McCord testified that he discussed the ESOP with the ABC board in July 1988.

that the essential elements for a conspiracy were proved beyond a reasonable doubt.[21]

### 2.

In the alternative, McCord and Haley contend that the evidence establishes that the stock transfer to McCord falls within § 1954's "bona fide compensation" exception to criminal liability. As quoted earlier, that exception permits

> the payment to or acceptance by any person of bona fide salary, compensation, or other payments ... for services actually performed in the regular course of his duties as ... officer, trustee, ... or employee of such plan, employer, ... or organization providing benefit services to such plan.

18 U.S.C. § 1954.

The Government interprets the exception to apply only to compensation (to include "other payments") for services rendered for the ESOP, and therefore maintains that it is inapplicable, because Haley and McCord both concede that the stock transfer was not for services that McCord performed for the ESOP. We agree, however, with Haley and McCord that the exception is not limited to

---

[21] Several circuits have held that proof of specific intent is not required under the "because of" prong of § 1954. *United States v. Soares*, 998 F.2d 671, 672-74 (9th Cir. 1993), *cert. denied*, ___ U.S. ___, 114 S. Ct. 927 (1994); *United States v. Pieper*, 854 F.2d 1020, 1024-26 (7th Cir. 1988); *United States v. Romano*, 684 F.2d 1057, 1063-64 (2d Cir.), *cert. denied*, 459 U.S. 1016 (1982); *United States v. Friedland*, 660 F.2d 919, 925-27 (3d Cir. 1981), *cert. denied*, 456 U.S. 989 (1982). Haley contends that, irrespective of the intent required for violation of § 1954, the Government failed to prove that he specifically intended to agree to violate § 1954, as required for proof of conspiracy under 18 U.S.C. § 371. We disagree. As shown above, there was ample circumstantial evidence that Haley and McCord specifically intended to agree to transfer ABC stock to McCord because of his actions or decisions as a trustee.

services performed for the ESOP; its plain language indicates otherwise.  Among other things, the exception applies to "bona fide salary, compensation, or other payments" (payments) to an officer, such as McCord, "for services ... performed in the regular course of his duties as ... officer ... of [an] employer", such as ABC, "whose employees are covered by [a] plan".  Nevertheless, we do not agree that Haley and McCord qualify for the exception; their interpretation overlooks the requirement that the payments be "bona fide".[22]

Although § 1954 does not define "bona fide", we can easily discern its intended meaning by reading it as a whole.  *See, e.g.*, N. Singer, 2A *Sutherland Statutory Construction* § 46.05, at 103 (5th ed. 1992) ("each part or section [of a statute] should be construed in connection with every other part or section so as to produce a harmonious whole"; "it is not proper to confine interpretation to the one section to be construed") (footnotes omitted).  Section 1954 first describes what is prohibited -- *inter alia*, the receipt of a thing of value "because of" any actions or decisions relating to the benefit plan.  It then describes, in the exception, what is not prohibited  -- *inter alia*, the payment or acceptance of "bona fide salary, compensation, or other payments

---

[22]  As noted, the exception is not limited to salary or compensation; it includes "other payments".  Accordingly, although McCord was not an employee of the corporation that transferred stock to him, so that the transfer was not salary or compensation as those terms are understood in their normal employer/employee sense, the transfer was a form of "other payments" that might qualify for the exception.  But, as discussed *infra*, the exception is satisfied only if the "salary, compensation, or other payments" are "bona fide".

... for services actually performed in the regular course of ... duties". (As noted, this includes duties as an officer of the employer providing the ESOP.) When the exception is read in context with the remainder of § 1954, it is clear (indeed, most obvious) that the exception does not apply to payments to an officer of an employer providing an ESOP or to a trustee of the ESOP "because of" his actions or decisions relating to the plan if they are not "in the regular course of his duties". In other words, payments given or received with that motivation are not "bona fide" within the meaning of the exception.[23]

As discussed, there was ample evidence that Haley's stock transfer to McCord ("other payments") was not motivated by McCord's performance as a bank officer (bona fide), but because, as an ESOP trustee, he had the authority to make decisions with respect to the manner in which the ESOP would be funded. Accordingly, the transfer does not qualify for § 1954's exception.[24]

---

[23]    Our reading is consistent with the jury charge: "bona fide" was defined as "in good faith, exclusive of fraud or deceit". Neither Haley nor McCord challenge that definition.

[24]    Haley contends that the district court erred by denying his motion to dismiss the indictment, because the Government failed to charge that his conduct did not fall within the exception. Prior to trial, he did not move to dismiss the indictment on this ground; he did so during, and after, trial. Fed. R. Crim. P. 12(b)(2) and (f) provide that objections based on defects in the indictment, other than those attacking jurisdiction or claiming that the indictment fails to charge an offense, are waived if not made prior to trial. *See*, *e.g.*, **United States v. Mouton**, 657 F.2d 736, 739 n.3 (5th Cir. 1981). Because Haley's objection is that the indictment fails to charge an offense, it was not waived.

In any event, the objection fails. "Generally, a statutory exception to an offense need not be alleged in the indictment and the burden of proving compliance with the exception is upon the

B.

McCord and Haley each challenge the jury instructions on conspiracy. McCord contends that the district court erred by giving the Government's requested instruction on the § 1954 exception; Haley, that the court erroneously refused his requested instructions on his defensive theory, and erroneously instructed that the evidence proved a conspiracy if it showed that the defendants "or either of them" knew the unlawful purpose of the agreement and willfully joined the conspiracy.

"We afford the district court substantial latitude in formulating its instructions, and we review a district court's refusal to include a defendant's proposed jury instruction for abuse of discretion". *United States v. Chaney*, 964 F.2d at 444. In applying this standard, we review the charge "as a whole to determine whether that instruction fairly and accurately reflects the law and covers the issues presented in the case". *Id*. "[W]here the contention is that the district court has refused to give an instruction, we determine whether the requested instruction: (1) is a correct statement of the law; (2) was

defendant". *United States v. Outler*, 659 F.2d 1306, 1309 n.3 (5th Cir. 1981), *cert. denied*, 455 U.S. 950 (1982). Section 1954 is not one of those "rare instances [where] an exception can be so necessary to a true definition of the offense that the elements of the crime are not fully stated without the exception". *Id*. at 1310; *see also* **Sutton v. United States**, 157 F.2d 661, 665-66 (5th Cir. 1946) ("In an indictment ..., it is not necessary to negative the matter of an exception made by a proviso or other distinct clause in the statute, whether in the same section or elsewhere; but, if the exception itself is incorporated in the definition of the offense so that the elements of the crime are not fully stated without the exception, then it must be negatived".) (footnote omitted).

substantially given in the charge as a whole; and (3) concerns an important point in the trial, the omission of which seriously impaired the defendant's ability to present a given defense effectively".  *Id*.

1.

As noted, the district court gave the Government's requested instruction on § 1954's exception.  After stating the language from § 1954, to include the exception, it provided in part that

> bona fide salary, compensation or other payments means that the salary, compensation or other payments w[ere] received in good faith, exclusive of fraud or deceit.  An administrator, officer, trustee, custodian, counsel, agent or employee of such plan, employer, employee organization or organization providing benefit plan services to such plan must disclose the salary or compensation, that he is receiving, to qualify for the bona fide compensation exception.[25]

This portion of the instruction was based on *United States v. Schwimmer*, 924 F.2d 443 (2d Cir.), *cert. denied*, ___ U.S. ___, 112 S. Ct. 55 (1991). The defendant in *Schwimmer* was an investment advisor to pension plan trustees, and was convicted of violating § 1954 for failing to report commissions from financial institutions for the placement of plan funds.  *Id*. at 447-48.  The jury charge in *Schwimmer* defined "`bona fide' to mean `in good faith or without deceit or fraud'"; and, in response to a jury request for clarification, it was instructed "that a fiduciary must disclose the actual commission he is charging in order to qualify for the

_____

[25]   As noted, the language of the exception preceded this part of the instruction.  It was read to the jury twice:  with respect to count two and to count three (the § 1954 substantive charges).

- 19 -

bona fide compensation exception". *Id*. at 448. The Second Circuit, rejecting Schwimmer's challenge to the instruction, stated:

> "Bona fide" literally means in good faith, exclusive of fraud or deceit. It cannot be said that one who receives a commission from a financial institution for placing employee benefit plan funds, without disclosing to the plan the actual commissions received, is acting in good faith .... Because [§] 1954 uses broad language to protect plan beneficiaries from dishonest or unfaithful fiduciaries, it seems clear that the statute was meant to reach Schwimmer's intentional failure to inform the trustees ... that he was extracting a commission from the placement of their investments.

*Id*.

As noted, McCord does not contend that the instruction erroneously defined "bona fide"; nor does he contend specifically that it was error to instruct that good faith requires disclosure. Instead, he asserts that the instruction based on *Schwimmer* is inapplicable because he received the 35,717 shares from Haley, through Leisure Valley, as compensation for his past services at ABC, not as compensation for his services on behalf of the ESOP, unlike the defendant in *Schwimmer*, whose commissions were directly related to his activities for the pension plan.

First, the jury was instructed on McCord's theory of defense. Second, McCord's position is based on an erroneous interpretation of the exception. As discussed, compensation paid to or received by a trustee because of his actions or decisions with respect to the plan that are not performed in the regular course of his duties is not "bona fide" within the meaning of § 1954. Therefore, McCord

has not demonstrated that the district court abused its discretion through its exception instruction.

2.

The district court refused to instruct the jury on Haley's defensive theory -- that he complied with all of the laws governing ESOPs, and that he sold the stock to McCord at a discount as compensation for his services at ABC. Because the indictment contained references to ERISA and terms defined by it, Haley's requested instructions sought to submit other portions of ERISA "so that the jury could understand `the rest of the story'". Haley requested that the jury be instructed (1) that § 1954 does not prohibit the payment of bona fide compensation to a bank employee for services actually performed; (2) on the fiduciary duties of an ESOP trustee under ERISA; (3) that, under ERISA, an ESOP trustee has no duty to inform shareholders of a proposed stock purchase by the ESOP; (4) on the good faith provision of ERISA; and (5) on a summary of conduct permitted and prohibited by ERISA. He maintains that the charge, which contained instructions on the bona fide compensation exception for the substantive violations of § 1954 charged in counts two and three, but did not contain them with respect to the conspiracy charged in count one, misled the jurors to believe that they could not apply the exception to that count. He maintains that, because the charge on the conspiracy count lacked both the statutory exception and the instructions explaining the relevant portions of ERISA, the jury lacked any information about his theory of defense on the conspiracy count.

We disagree.  As noted, the jury was instructed twice on the exception (for counts two and three).  Considering the instructions as a whole, there is no basis for Haley's assumption that the jury was misled to believe that the exception was inapplicable to the conspiracy charge.  And, Haley was charged with a criminal conspiracy to violate § 1954; he was not charged with civil violations of ERISA.  The requested instructions, pertaining to civil violations of ERISA, do not constitute a legally sufficient defense to the conspiracy charge.  *See **United States v. Hammons***, 566 F.2d 1301, 1303-04 (5th Cir.), *vacated on other grounds*, 439 U.S. 810 (1978) (because facts of case did not demonstrate a legal defense to the crime charged, trial court did not err in refusing to instruct the jury on defendant's defense).  Accordingly, the district court did not abuse its discretion in denying Haley's requested instructions.

3.

Haley maintains that the instruction on the elements of conspiracy, by including the words "or either of them", erroneously allowed the jury to convict him without requiring it to find that he had the requisite intent to be a conspirator.  The instruction provided in part:

> [Section 371] makes it a crime for anyone to conspire with someone else to commit an offense against the laws of the United States.
>
> ....
>
> A conspiracy is an agreement between two or more persons to join together to accomplish some unlawful purpose.  It is a kind of partnership in crime in which each member becomes the agent of

- 22 -

every other member. For you to find the defendants, *or either of them*, guilty of these crimes, you must be convinced that the government has proved each of the following beyond a reasonable doubt.

First that two or more persons made an agreement to commit the crime of [violating § 1954] ....

Second, that the defendants, *or either of them*, knew the unlawful purpose of these agreements and joined in it willfully, that is, with the intent to further the illegal purpose.

And, third, that one of the conspirators, during the existence of the conspiracy, knowingly committed at least one of the overt acts described in the indictment in order to accomplish some object or purpose of the conspiracy.

(Emphasis added.)

Haley takes the words "or either of them" out of context. That language, used for the second element of conspiracy, merely mirrors the preceding language used for the definition of conspiracy. It informed the jury that a finding of guilt as to one of the defendants did not require a finding of guilt as to the other.

In any event, "the presence of an imprecise or misleading statement within the jury instruction does not by itself entitle defendants to a reversal. Reversible error exists only if the jury charge, considered as a whole, misled the jury as to the elements of the offense". *United States v. Kington*, 875 F.2d 1091, 1098 (5th Cir. 1989). Even assuming that the challenged language was misleading, the charge, considered as a whole, would not have

permitted the jury to convict Haley unless it found that he had the requisite knowledge and intent to join the conspiracy.[26]

C.

In addition to challenging the sufficiency of the evidence for conspiracy, McCord contests it for his convictions for false entries, misapplication of funds, unlawful participation, and filing a false tax return.  In this and the next three parts, we deal with those claims.  Again, they present a classic example of why our review of a jury verdict is most narrow.

Concerning an air conditioner, McCord was convicted for making, or causing to be made, false entries in ABC's records, in violation of 18 U.S.C. § 1005.  The Government had to prove that: "(1) an entry made in bank records is false; (2) [McCord] made the entry or caused it to be made; (3) [he] knew the entry was false at the time he ... made it; and (4) [he] intended that the entry injure or defraud the bank or public officers".  **United States v. Chaney**, 964 F.2d at 448.[27]  "The government need not prove intent to cause the bank injury; all that is required is that the

---

[26]    Obviously, not having found error with respect to any of Haley's contentions, we reject his assertion that the cumulative effect of multiple errors requires reversal of his conviction.

[27]    In relevant part, 18 U.S.C. § 1005 makes it a crime to

> make[] any false entry in any book, report, or statement of such bank, ... with intent to injure or defraud such bank, ... or to deceive any officer of such bank, ... or the Comptroller of the Currency, or the Federal Deposit Insurance Corporation, or any agent or examiner appointed to examine the affairs of such bank, ... or the Board of Governors of the Federal Reserve System ....

- 24 -

defendant intended to defraud one or more of the bank's officers, auditors, examiners, or agents". *Id*. at 449.

Control Temp installed two air conditioning units at McCord's residence in late 1987. In mid-1989, he told Dan Peterson with Control Temp that one of the units was defective; and Peterson replied that he would replace it when the renovations on McCord's home were completed. They were completed that June.

In August 1989 there was a potential tenant for a house owned by ABC, but it was missing an air conditioner. Therefore, McCord asked Control Temp to provide a unit. Peterson testified that McCord asked him what it would cost to install at ABC's house a unit from McCord's residence and to install a new unit at his residence; that he gave McCord the price; that "we did it"; and that McCord told him to "send the bill to the bank".

ABC received an invoice from Control Temp for $2,950.87. Peterson testified that the price included removing the unit from McCord's residence, installing it at ABC's house, and installing a new unit at McCord's residence.[28] Of critical importance, Peterson testified further that, if he had not had to make the "change-out" from McCord's residence, he would have charged $300-400 less to install a new unit at ABC's house.

The invoice does not reflect, however, that a new unit was installed; it simply states, "installed 2.0 ton Janitrol heat pump", and lists the installation address as that of the ABC house.

---

[28]   It is clear from Peterson's testimony and the amount of the invoice that part of that amount was for the purchase of a new unit.

Sylvia Owens, ABC's vice president, who was responsible for the "other real estate owned" property files, testified that the invoice caused her to believe that a new unit had been installed at ABC's house. There was proof that the used unit at McCord's home was worth less than the new unit substituted for it.

## 1.

McCord maintains that the entries were literally true. "[A]n entry cannot be `false' within the meaning of [§ 1005] when it correctly reflects the transaction and was so intended." *United States v. Hughes*, 726 F.2d 170, 172 (5th Cir. 1984) (internal quotation marks and citation omitted). But, "[t]he omission of material information, as well as actual misstatements, qualifies as a false entry under 18 U.S.C. § 1005". *Chaney*, 964 F.2d at 450 n.39.

Obviously, the evidence is more than sufficient to prove that McCord made a false entry through a material omission, by concealing that ABC was paying for both a new unit at his residence and the installation of his used unit at ABC's house. Neither the invoice nor ABC's books and records reflect that McCord's used unit, worth less than a new unit, was installed at ABC's house, or that a new unit was installed at McCord's residence, or that the invoice was greater because of the cost of the work in changing out the units. As a result, ABC's books did not accurately reflect the bank's condition.

Claiming that the Government failed to prove that he approved the invoice for payment, McCord contends that the evidence was therefore insufficient to prove that he "made or caused to be made" the entries.

The invoice has notations by Sheila Cadena, an ABC officer, indicating that entries of $1,634.06 and $1,316.81 were to be made in ABC's "other real estate owned" expense and asset accounts, respectively, totaling $2,950.87 (the amount of the invoice); and the Government introduced evidence that the two entries were made on ABC's books. Cadena testified that "[t]hose account numbers would have come from Sylvia Owens or Mr. McCord[,] I can't remember which one"; nor could she recall who made the entries in ABC's records. And, McCord testified that he did not recall giving instructions as to the amounts to be entered on the account records.

Owens testified that she had the authority to approve bills for payment and frequently did so, but that she was on vacation when the unit was installed and the bill paid. McCord testified that he saw the invoice for the first time during trial preparation; that he always placed his initials on an invoice when approving it for payment; that his initials do not appear on the invoice; that any bank officer (Owens, Cadena, Joe Nieto, or himself) had the authority to approve bills for payment; and that, had he seen the invoice, he probably would have authorized payment

because it was "exactly correct", and he saw no problem with handling the transaction that way.[29]

Cadena testified, however, that, when ABC received the invoice, she placed it in the accounts payable folder and gave the folder to McCord for approval by placing it on his desk. A copy of the cancelled check was introduced into evidence, reflecting that the invoice was paid.

In sum, the evidence was sufficient for the jury to find that McCord caused the entries to be made.

## D.

Again concerning the air conditioner, McCord asserts that the Government failed to prove that he willfully misapplied bank funds, in violation of 18 U.S.C. § 656, because there was no evidence that he acted with the intent to defraud or injure the bank. This is one of the several elements of proof. *United States v. Kington*, 875 F.2d 1091, 1100 (5th Cir. 1989).[30]

As discussed, there was sufficient evidence for the jury to find that McCord intended to defraud ABC by having a used unit from his home installed at ABC's house and a new unit installed at his

---

[29] McCord testified that he believed that Peterson was replacing the unit at his house under warranty, and that had a bill been submitted to him for the work done at his house, he would have paid it.

[30] 18 U.S.C. § 656 makes it a crime for

> an officer, director, agent or employee of, or connected in any capacity with any ... insured bank ... [to] willfully misappl[y] any of the moneys, funds or credits of such bank ....

home, telling the installer to "send the bill to the bank", and approving the invoice for payment.

## E.

For a second violation of § 1005, McCord was convicted for unlawfully receiving $17,000 of the proceeds of a $45,000 loan from ABC to his brother-in-law, Scott Finney.  Under that section, it is also unlawful to receive, directly or indirectly, any money or other benefit through any transaction or other act of a financial institution, with intent to defraud the institution.[31]  Among other things, the jury was instructed that a § 1005 violation required proof that McCord received money directly or indirectly through a loan from ABC, and did so with the intent to defraud ABC.   A B C financed Finney's subcontracts at an air base; but when Finney approached McCord about borrowing $45,000 from ABC, because he had underbid his first jobs, McCord refused the loan.  Finney then asked McCord to personally loan the money; and McCord did so in the amount of $22,000, drawing on his $25,000 line of credit at ABC.

_____

[31]     Section 1005 provides, in relevant part:

> Whoever with intent to defraud the United States or any agency thereof, or any financial institution ... participates or shares in or receives (directly or indirectly) any money, profit, property, or benefits through any transaction, loan, commission, contract, or any other act of any such financial institution--
>
> Shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1005.

Later, Finney received a $45,000 loan from ABC, with Owens listed as the loan officer. The application stated that the loan's purpose was "renewal of loans originally for wedding expenses and to purchase inventory. New proceeds are to fund contract".[32] From the loan proceeds, $42,668.78 was deposited into the account of Finney's company; from that account, $17,000 was then transferred to Finney's personal account; Finney then transferred $17,000 to McCord's account; and McCord used those funds to reduce his indebtedness on his line of credit at ABC. Ultimately, the loan was charged off, without Finney having made any payments on it.

### 1.

McCord contends, without citation to authority, that § 1005, like 18 U.S.C. § 656 (misapplication of funds), requires proof of a causal connection between the defendant's status as an officer and the making of the loan. *See* **United States v. McCright**, 821 F.2d 226, 230 (5th Cir. 1987), *cert. denied*, 484 U.S. 1005 (1988) (§ 656 requires proof that defendant, through his position at bank, authorized or caused loan to be authorized). Accordingly, he maintains that the Government was required "to prove that [he] was the loan officer who caused the $45,000 line of credit to ... Finney to be authorized".

We need not address whether § 1005 requires such proof, because McCord neither requested an instruction on that element, nor objected to the charge, which did not include that element.

---

[32]   ABC had loaned Finney $8,000 to purchase inventory and $3,000 for wedding expenses.

Because McCord failed to object, as required by Fed. R. Crim. P. 30, we review this issue only for plain error. *See* **United States v. Rodriguez**, 15 F.3d 408, 414-17 (5th Cir. 1994). We need not determine under the plain error analysis whether there was error, or, if error, whether it was "plain", because, even assuming both, we would decline to exercise our discretion to correct it, in that McCord's substantial rights were not affected. There was evidence that McCord caused the loan to be authorized. Owens testified that she was Finney's "per se loan officer", but that McCord participated in, and influenced, her decisions regarding approval of Finney's loans. And Sandra Maldonado, an ABC employee when the loan was made, testified that, pursuant to McCord's instructions, she prepared the loan worksheet for the $45,000 loan to Finney.

### 2.

Contending that the Government failed to prove that he acted with intent to injure or defraud ABC by receiving the $17,000, McCord points out that Finney was current on all loans at ABC when the loan was made and had never been in default. Nevertheless, the loan application does not reflect that $17,000 of the proceeds were for McCord rather than for the stated purposes. There was sufficient evidence for the jury to find that McCord acted with the requisite intent.

### F.

McCord was convicted for subscribing a false tax return under penalty of perjury, in violation of 26 U.S.C. § 7206(1). A § 7206(1) violation is established by proof that (1) the defendant

willfully made and subscribed to a return; (2) the return contained a written declaration that it was made under penalties of perjury; and (3) the defendant did not believe that the return was true as to every material matter. *United States v. Wilson*, 887 F.2d 69, 72 (5th Cir. 1989).

IRS Special Agent Lange testified that McCord reported taxable income of $29,251 for 1988, but failed to report approximately $83,181, consisting of (1) a capital gain of $2,550 from the sale of 3,000 shares of ABC stock purchased from Leisure Valley for $1.15 per share and sold to the Alleys for $2.00 per share;[33] (2) a capital gain of $41,371 from the sale of 34,477 shares of ABC stock purchased from Leisure Valley for $1.15 per share and sold to the ESOP for $2.35 per share; and (3) other income of $39,260, consisting of the difference between the purchase price of $1.15 per share and the value of $2.35 per share for the 35,717 shares of ABC stock transferred to McCord by Leisure Valley.[34]

---

[33]    McCord testified that he discovered the sale to the Alleys when preparing for trial, and admitted that he made a mistake by not including it on his tax return.  As noted *infra*, he asserts that, because the amount was not substantial, this omission, alone, is not violative of § 7206(1).

[34]    As stated, McCord claims that he paid for the 34,477 shares, and received the 35,717 shares as a gift from Haley; Haley, that to reward McCord, he sold him all 70,194 shares at a discount ($1.15 per share).  As also noted, on its income tax return, Leisure Valley reported the transfer of all 70,194 shares as a sale.  Lange testified that, assuming McCord had purchased the 34,477 shares for $2.35 per share and had paid nothing for the 35,717 shares (McCord's claim), there would have been no taxable gain on the sale of the 34,477 shares to the ESOP (sold for same price as purchased); but, with respect to the 35,717 shares (if not considered a gift), there would have been a $6,000 gain on the 3,000 shares sold to the Alleys for $2.00 a share, and a $76,884 gain on the remaining 32,717 shares.  Lange testified that, viewing

- 32 -

McCord contends that the evidence was insufficient to prove that his income "was substantially in excess" of that reported, asserting that the 35,717 shares from Leisure Valley were a non-taxable gift and "could not logically be considered to be compensation" because he was not employed by Leisure Valley[35]; that there was no gain on the 34,477 shares he sold to the ESOP, because he sold them for the price he paid for them; and that the unreported gain from the sale of 3,000 shares of stock to the Alleys is not substantial.[36] McCord contends that the only rational explanation for his wife's acquittal on the tax charge, despite proof that she wrote the check to Leisure Valley to purchase the stock, is that the jury concluded that the 35,717 shares were a nontaxable gift.

But, McCord overlooks his testimony that his wife had nothing to do with the preparation of the tax return and that he accepted full responsibility for its contents. Because that testimony

the transaction in this manner, the effect on the tax owed would be nearly the same as if all of the shares were purchased by McCord at $1.15 per share.

[35] With regard to the earlier discussed "bona fide compensation" exception under § 1954, McCord's position on the tax charge may, at first glance, seem inconsistent, because on the one hand, with respect to the conspiracy charge, he claims that the 35,717 shares received from Leisure Valley fall under that exception for his past services at ABC; but, on the other hand, with respect to the tax charge, he claims that they were a gift, maintaining that they cannot be considered compensation because he was not employed by Leisure Valley. The positions are not inconsistent; as discussed *supra*, the exception includes not only salary and compensation, but also "other payments made".

[36] McCord calculates this gain as $3,000, using the donor's (Leisure Valley's) basis of $1.00 per share and the sale price of $2.00 per share.

provides an equally rational explanation for his wife's acquittal, we refuse to speculate that the jury might have acquitted her because it believed the 35,717 shares were a gift.

Moreover, there was overwhelming evidence that the 35,717 shares were taxable compensation. Agent Lange testified that a "true gift" is not included in income, but that, if given as a reward, compensation, perk, or fringe benefit, rather than out of charity and kindness, with no disinterested or detached generosity involved, "it may be called a gift, but it is compensation for services. And compensation for services is always taxable". She testified further that the relationship of the parties plays a significant role in determining whether something is a gift; that property given to a person by or for or on behalf of an employer cannot be excluded from income; that gifts, in amounts greater than $25, are not deductible on corporate tax returns; that, on its 1988 tax return, Leisure Valley reported the transfer of all 70,194 shares to McCord as a sale at $1.15 per share; and that, based on her examination of Leisure Valley's return, it did not appear that the transfer of 35,717 shares was a gift.

McCord testified that he received the ABC stock from Haley, through Leisure Valley, because Haley knew that he did not "earn a salary that was exorbitant" and that he had worked "late hours", and recognized that, as a result of his efforts, he "had made the stock go up in value"; that Haley gave him the shares because Haley's "stock had increased [in value] due to ... my work in the bank ... and he was giving me a gift". Similarly, McCord states in

his brief that the "35,717 shares of stock was a gift made by Mr. Haley through Leisure Valley, Inc. *as a reward for Mr. McCord's past services at [ABC]*".  (Emphasis added.)

Likewise, bank examiner Robinson testified that McCord told her that the stock was "for his services at the bank" and that it "was Mr. Haley's way of compensating him" because "he had done a good job at the bank".  FBI Agent Alaniz testified that Haley stated in an interview that he "wanted to reward Mr. McCord for doing an outstanding job with the bank"; and that McCord stated in an interview that the stock transferred to him from Leisure Valley was a gift "to reward him for the hard work, [that] he had done, during the years when the bank was struggling to be turned around".

The Government sustained its burden of proving that the 35,717 shares constituted taxable compensation rather than a nontaxable gift.  Accordingly, McCord's income for 1988 was substantially in excess of that reported.

G.

Haley asserts that the district court abused its discretion by denying his motions for severance, maintaining that he was prejudiced by the spillover effect of overwhelming evidence of McCord's dishonesty on counts unrelated to the ESOP conspiracy. The foregoing review, in numbing detail, of the evidence underlying the charges against Haley, and the more numerous charges against McCord, provides a good backdrop for reviewing this contention.  In the light of McCord's actions for which he was convicted, it is

- 35 -

most understandable why Haley sought a severance. But, more is required.

Rule 8(a) of the Federal Rules of Criminal Procedure authorizes joinder of offenses which are "of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan". Fed. R. Crim. P. 8(a). And, Rule 8(b) provides for the joinder of defendants in the same indictment "if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses". Fed. R. Crim. P. 8(b). "[D]efendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count". *Id*. The conspiracy and substantive offenses charged in counts one-three against McCord and Haley were based on the same transaction -- the transfer of stock from Haley to McCord because of McCord's position as an ESOP trustee. Accordingly, joinder was proper under Rule 8.

On the other hand, Rule 14 offers relief from prejudicial joinder; it states, in pertinent part:

> If it appears that a defendant ... is prejudiced by a joinder of offenses or of defendants in an indictment ... or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires ....

Fed. R. Crim. P. 14. "If joinder is proper in the first instance under Rule 8, the denial of a motion for severance is reviewable

- 36 -

only for an abuse of discretion". *United States v. Faulkner*, 17 F.3d 745, 758 (5th Cir. 1994).

Generally, "persons who are indicted together should be tried together". *United States v. Arzola-Amaya*, 867 F.2d 1504, 1516 (5th Cir.), *cert. denied*, 493 U.S. 933 (1989). It goes without saying that this is especially true when the defendants are charged with the same conspiracy. *United States v. McGuire*, 608 F.2d 1028, 1031 (5th Cir. 1979), *cert. denied*, 446 U.S. 910 (1980). A "[s]everance under [Rule] 14 is an appropriate remedy for a disparity in the evidence only in the most extreme cases". *United States v. Harrelson*, 754 F.2d 1153, 1175 (5th Cir.) (brackets in original; internal quotation marks and citation omitted), *cert. denied*, 474 U.S. 908, 1034 (1985). Along that same line, "the mere presence of a spillover effect does not ordinarily warrant severance". *Faulkner*, 17 F.3d at 759 (internal quotation marks and citation omitted). To demonstrate an abuse of discretion, Haley "must show that: (1) the joint trial prejudiced him to such an extent that the district court could not provide adequate protection; and (2) the prejudice outweighed the government's interest in economy of judicial administration". *United States v. DeVarona*, 872 F.2d 114, 120-21 (5th Cir. 1989). Haley must demonstrate "specific and compelling prejudice". *Faulkner*, 17 F.3d at 759 (internal quotation marks and citation omitted). He has not done so.

During both voir dire and trial, and in its charge, the court instructed the jury to consider separately the charges against each defendant. *See Faulkner*, 17 F.3d at 759 (noting that "[s]imilar

instructions have been held sufficient to cure any possibility of prejudice"); *Arzola-Amaya*, 867 F.2d at 1516 (instruction to "consider each offense separately and each defendant individually ... sufficiently enabled the jury to `compartmentalize' such evidence and prevent any `spillover' from tainting another appellant's case"). Furthermore, the physical evidence was designated so that the jury could easily sort that pertaining to each of the counts and each of the defendants.[37]

Finally, the acquittal of each of the defendants on at least one count reflects that the jury was able to sort and consider separately the evidence applicable to each of the counts and each of the defendants. *See Faulkner*, 17 F.3d at 759 (fact that "each appellant was acquitted on one or more counts ... supports the inference that the jury considered separately the evidence as to each defendant and each count"). The district court did not abuse its discretion in denying a severance.

## H.

The Government concedes that the *ex post facto* clause, U.S. Const. art. I, § 9, prohibits McCord's prosecution for money laundering, because 18 U.S.C. § 1005, which he violated by making the $17,000 deposit from the proceeds of the $45,000 ABC loan to Finney on February 28, 1990, did not become a specified unlawful activity under the money laundering statute, 18 U.S.C. §

---

[37]     The exhibit numbers relating to the ESOP were preceded by "E", the tax exhibits by "T", the air conditioner exhibits by "A", the bribery exhibits by "B" (as noted, McCord was acquitted of soliciting kickbacks), and the Finney loan exhibits by "M".

1956(c)(7), until nine months later, November 29, 1990. Accordingly, we reverse McCord's conviction on that charge.

## I.

McCord challenges four aspects of his sentence: calculation of the amount of tax loss; increases in his offense level for both abuse of a position of trust and more than minimal planning; and denial of a reduction for acceptance of responsibility. "We will uphold a sentence imposed under the Sentencing Guidelines so long as it is the result of a correct application of the Guidelines to factual findings which are not clearly erroneous". *United States v. Mora*, 994 F.2d 1129, 1141 (5th Cir.), *cert. denied*, ___ U.S. ___, 114 S. Ct. 417 (1993).

### 1.

McCord contends that, for calculating his sentence on the tax count, the amount of tax loss should have been based only on his omission of the gain from the sale of 3,000 shares of ABC stock to the Alleys. As discussed, he maintains that the only rational explanation for his wife's acquittal on the tax count, and his and Haley's acquittals for substantive violations of § 1954, is that the jury concluded that the 35,717 shares were a nontaxable gift.[38]

We review the district court's amount of tax loss finding only for clear error. *See* **United States v. Charroux**, 3 F.3d 827, 838 (5th Cir. 1993). Guideline § 2T1.3 is applicable to violations of

---

[38]  Obviously, our rejections of McCord's sufficiency of the evidence challenges on his conspiracy and tax convictions fly in the face of this contention and arguably render it unnecessary to address this issue.

26 U.S.C. § 7206(1), and provides in part that "the `tax loss' is 28 percent of the amount by which the greater of gross income and taxable income was understated".  U.S.S.G. § 2T1.3(1).

The probation officer calculated the loss as $23,290.92 (28% of unreported income of $83,181.85).  In finding the same amount of unreported income, the district court implicitly found that the 35,717 shares were not a gift.  As discussed *supra*, there is ample evidence to support this finding; it is not clearly erroneous.

### 2.

The Guidelines provide for a two-level increase in the offense level "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense".  U.S.S.G. § 3B1.3.  The commentary provides that "[t]he position of trust must have contributed in some substantial way to facilitating the crime and not merely have provided an opportunity that could as easily have been afforded to other persons".  *Id.*, comment. (n.1).  "The application of § 3B1.3 is a sophisticated factual determination reviewed under the clearly erroneous standard".  *United States v. Fisher*, 7 F.3d 69, 70 (5th Cir. 1993).

McCord challenges this increase, asserting that his position as bank president did not facilitate the misapplication of funds for the air conditioner, and there was no evidence that he approved the invoice, instructed anyone to pay it, or signed the check.[39]

---

[39]     The district court found that McCord abused his position of trust not only as to the air conditioner counts (false entries and misapplication of funds), but also as to his participation in the

But, he does not dispute that he occupied a position of trust. And, that position significantly facilitated his ability to arrange for ABC funds to be used for the installation of a new unit at his house, and to arrange for false entries to be placed on ABC's books. As discussed *supra*, there was evidence that the invoice was placed on McCord's desk for approval, and paid by ABC. The district court did not clearly err.

3.

"If the offense involved (A) more than minimal planning", the Guidelines provide for a two-level increase in the offense level. U.S.S.G. § 2F1.1(b)(2). For the offenses involving the air conditioner (false entries and misapplication of funds), McCord challenges this increase.

The Guidelines define "[m]ore than minimal planning" as "more planning than is typical for commission of the offense in a simple form". U.S.S.G. § 1B1.1, comment. (n.1(f)). "`More than minimal planning' also exists if significant affirmative steps were taken to conceal the offense". *Id*. "Whether ... a defendant engages in

proceeds of the $45,000 loan to Finney. McCord does not challenge the position of trust adjustment as to the latter. Arguably, if not obviously, the ruling on the Finney loan, alone, would be sufficient to impose the increase. But, because we cannot say with certainty that the abuse of trust ruling on the air conditioner counts, even if erroneous, would be harmless error in light of the similar ruling on the Finney loan, we must address the challenged ruling. *See **Williams v. United States***, ___ U.S. ___, 112 S. Ct. 1112, 1121 (1992) (remand not required "[i]f the party defending the sentence persuades the court of appeals that the district court would have imposed the same sentence absent the erroneous factor"). Among other things, the Government does not claim harmless error, even though it notes that "[i]t does not appear that ... McCord disputes the position of trust adjustment made as to count eight [Finney loan]."

more than minimal planning is a fact question reviewed under the clearly erroneous standard". *United States v. Barndt*, 913 F.2d 201, 204 (5th Cir. 1990).

As discussed, McCord arranged to have ABC pay for the installation of a new unit at his residence, and to have the used unit from his residence installed at ABC's house. He took steps to conceal the offense by causing false entries to be made on ABC's books. The district court did not clearly err in finding that the execution of this scheme involved more than minimal planning.

4.

The Guidelines provide for a two-level decrease in the offense level of a defendant who "clearly demonstrates acceptance of responsibility for his offense". U.S.S.G. § 3E1.1(a). McCord maintains that he was entitled to this reduction because he truthfully told the FBI about his conduct, voluntarily surrendered to authorities after being charged, and voluntarily resigned as president of ABC.

The Guidelines' commentary provides that, in determining whether a defendant qualifies for the reduction, the court may consider factors such as those urged by McCord. U.S.S.G. § 3E1.1, comment. (n.1). But the adjustment "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt" except in those "rare situations" in which the defendant "exercises his constitutional right to a trial ... to assert and preserve issues that do not relate to factual guilt (*e.g.*, to make a constitutional

challenge to a statute or a challenge to the applicability of a statute to his conduct)". U.S.S.G. § 3E1.1, comment. (n.2). Our standard of review "is more deferential than the clearly erroneous standard". *United States v. Burian*, 19 F.3d 188, 192 (5th Cir. 1994).

McCord put the Government to its burden of proof at trial, and did not admit the essential factual elements of guilt. As one of his witnesses at the sentencing hearing testified, McCord "has never, to this minute, admitted he willfully did anything wrong". The district court did not err in refusing the reduction.

## III.

For the foregoing reasons, the judgment against Haley is **AFFIRMED**; the judgment against McCord is **AFFIRMED**, except for his money laundering conviction, which is **REVERSED**, resulting in his sentence being **VACATED**, and his case **REMANDED** for resentencing consistent with this opinion.

**AFFIRMED IN PART; REVERSED, VACATED,** and **REMANDED IN PART**