UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 95-50645
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CLINTON MANGES; DAVID WAYNE MYERS; and CARL HUBERT SHANKLIN,

Defendants-Appellants.

_____

Appeals from the United States District Court for the
Western District of Texas
_____

April 15, 1997

Before REAVLEY, GARWOOD, and BENAVIDES, Circuit Judges.

BENAVIDES, Circuit Judge:

This appeal involves a plot to retain the oil and gas rights to a parcel of submerged property in Corpus Christi Bay, Nueces County, Texas, known as tract 350. The indictment alleged that appellants prevented the leased mineral rights from reverting to the state by submitting false documents to state regulatory agencies and making corrupt payments to a state official.

Appellants appeal their convictions and sentences on charges of conspiracy and mail fraud; their briefs teem with an overabundance of evidentiary, statutory, and constitutional

challenges. Many of these claims do not merit full discussion. We are persuaded by only one of appellants' arguments: Shanklin's contention that the conspiracy charge against him was time-barred.

## FACTUAL BACKGROUND

Clinton Manges has been described as a legendary figure in South Texas: an oilman and rancher, wheeler-dealer and political kingmaker. Born in poverty in Cement, Oklahoma, Manges amassed a billion-dollar fortune, only to face bankruptcy in 1989 and criminal charges in the instant case.[1] David Wayne Myers, the ringleader of the scheme alleged in the indictment, was an oil industry entrepreneur based in San Antonio, Texas. Carl Hubert Shanklin was an independent contractor who performed "workover" operations on oil and gas wells. Also named in the indictment was Benny Joe McLester, who as the "gauger" for tract 350 was responsible for accurately measuring and reporting its output.

It is unnecessary to detail the various corporate entities through which Myers wielded control over the operations on tract 350. We note simply that Myers, through companies he controlled, at relevant times subleased the oil and gas rights to tract 350 and three adjacent tracts; that his close business associate Morris D. Jaffe, Jr., acquired interests in the tracts through an assignment from Myers; and that Myers was instrumental in efforts to convince state regulators that the lease terms were being met.

---

[1]*See, e.g.*, David McLemore, *Oilman Manges Sentenced*, DALLAS MORNING NEWS, Aug. 26, 1995, at A1, *available in* 1995 WL 9055925.

The mineral rights to tract 350 were controlled by the Texas General Land Office (GLO), which grants subsurface oil and gas rights throughout Texas in a competitive bid process. Successful bidders are required to pay the state yearly rental fees, plus royalties representing a portion of their revenues. Under applicable state regulations, the holder of an oil and gas lease must act affirmatively to maintain the rights granted by the state. The lessee must (1) continuously produce oil and gas; (2) undertake timely and diligent workover efforts to restore or increase productive capacity; or (3) pay a "shut-in royalty" to the state, supported by an affidavit stating that there is no economic market for the tract's resources. To put it another way, if a market exists for a tract's oil and gas, and if the tract fails to produce for 60 days and is not worked over during that time, the lease reverts to the state. Once that happens, the GLO may re-lease the tract to the highest bidder.

It is undisputed that tract 350 should have reverted to the state for lack of production at the time of the events described in the indictment, if not earlier. Myers, Jaffe, and their colleagues, believing that the lease was worth millions, sought to prevent its reversion. Rather than meet the requirements imposed by state law, however, appellants submitted false documents to the GLO and tried to buy the favor of its chief clerk, Jack Giberson.

Appellants and others tried to prevent the reversion of the lease by a variety of methods. Specifically, viewing the evidence in the light most favorable to the verdict, Myers had McLester

3

prepare a series of false production reports claiming that tract 350 had produced various quantities of oil. The false production figures provided by McLester were duly reported to state regulators by the company nominally operating the tract.[2]

Moreover, Myers orchestrated the filing of false shut-in affidavits with the GLO. Three such affidavits were filed, claiming variously that the shut-in was based on the well's lack of production, a lack of market for its oil, and a severed gas line.

Myers swore out an affidavit on July 31, 1989, stating that tract 350 had been worked over at intervals of less than 60 days between June 28, 1988, and July 27, 1989. This affidavit was supported by daily time records and documents called morning field reports, prepared and signed by Shanklin. These documents purported to be contemporaneous records of the work described by Myers; according to the prosecution's evidence at trial, however, they were *post hoc* fabrications designed to convince the GLO that the lease to tract 350 had been maintained.

If Shanklin covered Myers' back in the oil fields of Corpus Christi Bay, Manges fronted for him in the government halls of Austin. Starting in the summer of 1988, Manges tried to convince his contacts in the GLO that the lease to tract 350 had been maintained. Some time that summer, Manges accompanied Jaffe to the GLO to discuss tract 350 with Giberson. Starting soon thereafter,

---

[2]The operator of record of an oil and gas lease must report its monthly production to the Texas Railroad Commission in a "P-1" report. The GLO relies on the accuracy of these reports, and was misled when the company operating tract 350 filed reports incorporating McLester's false data.

4

in August 1988, Manges made a series of five payments to Giberson totaling $30,100. The indictment listed the final two payments--$6,400 on July 11, 1989, and $3,700 on July 31, 1989--as overt acts in furtherance of the alleged conspiracy.

GLO staff members testified that Giberson did not actually influence their decisions regarding tract 350. Moreover, it is undisputed that Giberson did not keep the money; all five payments were deposited in the bank account of his son, Richard Giberson. Richard Giberson had been employed by the San Antonio Gunslingers professional football team; Manges, through a corporation, was the team's principal owner. The defense contends that the payments were partial satisfaction of a $70,000 debt that the Gunslingers corporation owed Richard.

Appellants' efforts to retain the lease to tract 350 seemed to bear fruit. On September 19, 1989, GLO staff geologist Tim Pittman mailed a letter to Jaffe's Redfish Bay Operating Co.--the tract's operator of record at the time--stating that the lease had been maintained.

As an epilogue to the conspiracy, Manges discussed tract 350 in two conversations the following spring with a longtime friend, Crandell Addington. The two friends discussed how Manges had done his "little magic" to save the lease. They specifically mentioned that documents were "fixed" and that Jack Giberson would not approve the lease unless Manges paid his son, Richard, $10,000. Addington secretly recorded these conversations, which were introduced at trial by the prosecution.

PROCEDURAL BACKGROUND

Appellants and co-defendant McLester were charged in a three-count indictment filed on September 14, 1994, in United States District Court.

The first count charged all four defendants with conspiracy to commit mail fraud and conspiracy to commit bribery. The mail fraud conspiracy had two alleged goals. Its first object was to deprive Texas citizens of money or property, *i.e.*, the lease to tract 350 and the additional royalties that the state would earn if the lease reverted and were rebid. The second object of the mail fraud conspiracy was to deprive Texas citizens of their intangible right to the honest services of a government official, later identified as Jack Giberson. 18 U.S.C. §§ 371 (conspiracy), 1341 (mail fraud), 1346 (mail fraud involving honest services), & 666 (bribery).

Count two charged McLester, Myers, and Shanklin with mail fraud. This substantive count incorporated the two theories underlying the mail fraud conspiracy charged in count one--deprivation of money or property and deprivation of the intangible right to honest government services. The mailing alleged in count two was the September 19, 1989 letter from the GLO to Redfish Bay Operating Co. stating that the lease to tract 350 had been maintained. 18 U.S.C. §§ 1341, 1346, & 2 (aiding and abetting).

Count three charged Manges alone with bribery. 18 U.S.C. § 666(a)(2).

Pursuant to a plea agreement, McLester pleaded guilty to count

6

one and testified against appellants at trial.  At the close of the evidence, the district court entered a judgment of acquittal for Manges on count three.  The court held the proof insufficient to establish that the GLO received more than $10,000 annually in federal aid, as required to support a federal bribery prosecution. *See* 18 U.S.C. § 666(b).  In its jury charge, the district court also deleted the conspiracy to commit bribery from count one.

On March 10, 1995, after a joint trial, Manges was convicted of conspiracy, and Myers and Shanklin were convicted of both conspiracy and mail fraud.  As discussed below, appellants were sentenced at a hearing in district court on August 25, 1995.


## DISCUSSION

### I.  *Appellant Shanklin's Statute of Limitations Defense*

Shanklin claims that he was prosecuted in violation of the applicable five-year statute of limitations.  *See* 18 U.S.C. § 3282. With respect to the conspiracy count only, we agree.  Our review is plenary.  *United States v. Workinger*, 90 F.3d 1409, 1412 (9th Cir. 1996) (citation omitted).

To satisfy the statute of limitations for mail fraud, the government must prove that the predicate mailing occurred in the five years before the indictment.  *United States v. Ashdown*, 509 F.2d 793, 798 (5th Cir.), *cert. denied*, 423 U.S. 829, 96 S.Ct. 48, 46 L.Ed.2d 47 (1975).  To satisfy the statute for conspiracy, the government must prove that a conspirator committed an overt act in furtherance of the conspiracy in the five years before the

7

indictment. *See Grunewald v. United States*, 353 U.S. 391, 396-97, 77 S.Ct. 963, 969-70, 1 L.Ed.2d 931 (1957).

Shanklin was indicted on September 14, 1994. Accordingly, the government was required to show that both the mailing element of the mail fraud count and at least one overt act in furtherance of the conspiracy occurred in a span of five years before that date. The government claims to have met this burden with respect to both offenses based on the September 19, 1989 letter from the GLO stating that the lease to tract 350 had been maintained. Shanklin argues that the GLO letter cannot serve as the predicate for either crime, and that the government failed to prove any other mailing or overt act within the limitations period.

**A.** *Mail Fraud*

Shanklin argues that the GLO letter cannot provide the basis for the mail fraud prosecution because the letter was not an "integral" part of the alleged scheme. *See United States v. Vontsteen*, 872 F.2d 626, 628 & n.2 (5th Cir. 1989) (reversing mail fraud conviction because the mailed invoices were not "integral" to the scheme) (citation omitted). Shanklin contends that the statutory period expired five years after the last relevant mailing mentioned in the indictment: the submission of a false morning field report to the GLO on July 27, 1989. In his view, the GLO letter of September 19 merely confirmed that the alleged scheme had been completed successfully.

We observe at the outset that the mailing in a federal mail fraud prosecution need not be sent by the defendant or his co-

conspirator.  It may be sent by a victim of the plot or an innocent third party, so long as the mailing is "incident to an essential part of the scheme, . . . or a step in [the] plot." *Schmuck v. United States*, 489 U.S. 705, 710-11, 109 S.Ct. 1443, 1448, 103 L.Ed.2d 734 (1989) (mailing element supplied by duped used-car retailers submitting title applications to state motor vehicles bureau).  *See also United States v. Pepper*, 51 F.3d 469 (5th Cir. 1995) (mailing element satisfied by defrauded investors' mailing money to defendant).

The success of the fraud alleged in this case depended upon an affirmative response from the GLO.  The scheme's purpose was to secure from the state of Texas the continued right to exploit the mineral resources of tract 350.  In our view, a written confirmation from the GLO was "integral" to the success of the scheme; it was a necessary step in the plot.

*Vontsteen*, relied on by Shanklin, does not lead us to a different conclusion.  In *Vontsteen* we held that the mailing of invoices by the victims of a completed fraud could not satisfy the mailing element.  However, we recognized that we might have reached the opposite conclusion had the invoices been "legally operative documents" that helped the defendant to complete the fraud.  The GLO letter was precisely the sort of "legally operative document" that we had in mind; it represented title to the mineral resources of tract 350.  As such, it was part and parcel of the fraudulent scheme.  The GLO letter thus satisfied the mailing element.  The government had five years from the mailing to indict Shanklin, and

9

it beat the deadline by less than a week.

**B.    *Conspiracy***

Shanklin claims that the September 19, 1989 mailing by the GLO was not the overt act of a conspirator, and thus cannot be considered the last overt act of the conspiracy for limitations purposes.  The previous overt acts alleged by the government were Manges' payment of $3,700 to Jack Giberson and Myers' submission of a false affidavit to the GLO.  Both these events took place on July 31, 1989--more than five years before Shanklin was indicted.  Consequently, he contends that the conspiracy charge was untimely.

The text of the federal conspiracy statute supports Shanklin's argument.  It provides in part:

> If two or more persons conspire . . . to commit any offense against the United States, . . . and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 371.  The statute thus explicitly provides that for the crime of conspiracy to be complete, one or more of the conspirators must have performed an overt act to bring about the object of the conspiracy.  This language cannot be stretched to include the posting of a letter by a non-conspirator.

We have echoed the statutory text: a conspiracy conviction requires proof of "[t]he commission of at least one overt act by one of the conspirators within [the five-year statutory] period in furtherance of the conspiratorial agreement."  *United States v. Davis*, 533 F.2d 921, 926 (5th Cir. 1976).

As the Supreme Court has explained:

10

> The function of the overt act requirement in a conspiracy prosecution is simply to manifest that the conspiracy is at work, and is neither a project still resting solely in the minds of the conspirators nor a fully completed operation no longer in existence.

*Yates v. United States*, 354 U.S. 298, 334, 77 S.Ct. 1064, 1085, 1 L.Ed.2d 1356 (1957) (internal citation and quotation marks omitted).  In this case, the government failed to show that the conspiracy was still a going concern in the five years prior to the indictment.  Accordingly, the indictment was untimely, and Shanklin, having preserved his objection, is entitled to reversal on Count One.[3]

## II.  *The Prosecution's Honest Services Theory*

The indictment alleged, and the jury was instructed to consider, a conspiracy and a fraudulent scheme with two objectives. The first goal was to obtain money or property through fraudulent means, in violation of 18 U.S.C. § 1341.  The second was to deprive Texas citizens of their right to the honest services of a state official, in violation of 18 U.S.C. §§ 1341, 1346.  Because the jury convicted appellants by a general verdict, we cannot determine whether the jury embraced the first theory, the second, or both.

Appellants contend that this ambiguity compels reversal of their convictions for three reasons.  First, they claim that the

---

[3]Although Manges and Myers each executed a written waiver of his statute of limitations defense, Manges now seeks reversal of his convictions due to prejudicial pre-indictment delay.  However, he does not contend that the government delayed in bad faith or to secure a tactical advantage.  We are therefore bound to reject his claim by the rule established in *United States v. Crouch*, 84 F.3d 1497, 1500 (5th Cir. 1996) (*en banc*), *cert. denied*, ---U.S.---, 117 S.Ct. 736, 136 L.Ed.2d 676 (1997).

11

prosecution's "honest services" theory is legally invalid.  Second,

they claim that even if the theory is valid today, it did not

become good law until the conspiracy was well under way, raising

the possibility of an *ex post facto* violation.  Finally, they

contend that the evidence was insufficient to support their

convictions based on the honest services theory.

**A.    *The Validity of the Honest Services Theory***

Appellants claim that the prosecution's honest services theory

is invalid as a matter of law, and that the jury may have convicted

them on this unsound basis.  They demand that their convictions be

vacated under the rationale of *Griffin v. United States*, 502 U.S.

46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991).[4]  Because appellants did

not raise this objection in the district court, the scope of our

review is limited.    The issue is whether the district court

committed plain error by submitting the honest services theory to

the jury.  *See generally* FED. R. CRIM. P. 52(b); *United States v.*

*Olano,* 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); *United*

*States v. Calverley*, 37 F.3d 160, 162-164 (5th Cir. 1994).

Appellants' attack on the validity of the honest services

---

[4]In *Griffin* the petitioner was convicted of a dual-object
conspiracy.  The Supreme Court held that the insufficiency of proof
with respect to one of the conspiracy's objects did not render the
conviction invalid.  However, the Court distinguished legal error
from factual insufficiency, explaining:

> When . . . jurors have been left the option of relying
> upon a legally inadequate theory, there is no reason to
> think that their own intelligence and expertise will save
> them from that error.    Quite the opposite is true,
> however, when they have been left the option of relying
> upon a factually inadequate theory, since jurors are well
> equipped to analyze the evidence.

*Griffin*, 502 U.S. at 59, 112 S.Ct. at 474 (citation omitted).

12

theory rests entirely on the panel opinion in *United States v. Brumley (Brumley II)*, 79 F.3d 1430 (5th Cir. 1996), *opinion vacated and reh'g en banc granted*, 91 F.3d 676 (5th Cir. 1996). The panel in *Brumley II* held that the federal mail fraud statute does not proscribe conduct which deprives the citizens of a state of the honest and impartial services of state officials. *Id.* at 1440. This was the view of the Supreme Court prior to the passage, in 1988, of 18 U.S.C. § 1346. In *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), the Court held that the mail fraud statute was limited in scope to the protection of property rights, and did not reach the intangible right to honest services. *Id.* at 360, 107 S.Ct. at 2882 (construing 18 U.S.C. § 1341). The Court in *McNally* perceived no constitutional obstacle to a broader statute, but stated: "If Congress desires to go further, it must speak more clearly than it has." 483 U.S. at 360, 107 S.Ct. at 2882.

Congress subsequently enacted Section 1346, which explicitly brings within the ambit of mail fraud "a scheme or artifice to deprive another of the intangible right of honest services." In a legislative history that has been described as "clear but sparse,"[5] members of Congress explained that the purpose of Section 1346 was to undo the Supreme Court's statutory interpretation in *McNally*. In *Brumley*, the *en banc* court is considering whether the amended mail fraud statute reaches the deprivation of citizens' right to

---

[5]Geraldine Szott Moohr, *Mail Fraud and the Intangible Rights Doctrine: Someone to Watch Over Us*, 31 HARV. J. ON LEGIS. 153, 169 (1994) (footnote omitted).

the honest services of public officials.

We need not answer that question today. It is enough to observe that numerous courts and commentators have interpreted Section 1346 as validating the honest services theory in the context of official corruption. *See, e.g., United States v. Paradies*, 98 F.3d 1266, 1283 n.30 (11th Cir. 1996), *pet. for cert. filed*, 65 USLW 3599 (Feb. 21, 1997) (No. 96-1346); *United States v. Frega*, 933 F.Supp. 1536, 1546-47 (S.D. Cal. 1996) (collecting cases).

Based on the overwhelming weight of authority recognizing the validity of the honest government services theory, we hold that it was not plain error to submit that theory to the jury in this case.

B.    *Ex Post Facto*

Appellants correctly observe that even if the honest services theory is valid today, it did not become good law until November 18, 1988, when Section 1346 took effect. They complain that the jury may have relied on events predating Section 1346 to convict them on the honest services theory, in violation of the *ex post facto* clause. U.S. CONST. art. I, § 9, cl. 3.

Myers' and Shanklin's mail fraud convictions do not violate the *ex post facto* clause. Mail fraud is a discrete offense; the crime is completed when the offending letter is mailed. *See United States v. Pazos*, 24 F.3d 660, 665 (5th Cir. 1994) ("Each separate use of the mails to further a scheme to defraud is a separate offense." (citation omitted)). In this case, the predicate mailing occurred on September 19, 1989--ten months and one day after

14

Section 1346 took effect. Reliance for this purpose on the GLO letter is not inappropriate, given the evidence that Myers submitted a false affidavit to the GLO on July 31, 1989, and that Shanklin falsified field reports as late as July 27, 1989. The Section 1341 scheme or artifice to defraud extended well beyond the effective date of Section 1346.

Unlike mail fraud, conspiracy is a continuing offense. *United States v. Bermea*, 30 F.3d 1539, 1577 (5th Cir. 1994), *cert. denied*, ---U.S.---, 115 S.Ct. 1113, 130 L.Ed.2d 1077 (1995). The conspiracy in this case straddled the effective date of Section 1346. Two of the alleged overt acts occurred before November 18, 1988; most of appellants' criminal conduct, including the two payments to Jack Giberson charged in the indictment as overt acts, occurred after that date. Because there is "substantial" evidence that appellants participated in the conspiracy after Section 1346 took effect, their prosecution under the honest services theory did not violate the *ex post facto* clause. *See Bermea*, 30 F.3d at 1577-78 (5th Cir. 1994) (citation omitted) (affirming sentence imposed under increased statutory maximum that took effect during conspiracy). *Accord United States v. Garfinkel*, 29 F.3d 1253 (8th Cir. 1994) (construing 18 U.S.C. § 1346).

**C.    *Evidence Supporting the Honest Services Theory***

Among numerous evidentiary challenges, appellants claim that the facts adduced at trial were insufficient to support conviction on the honest services theory. Because the jury may have relied on that theory, appellants urge reversal of their convictions.

15

There is no need for this court to decide whether the evidence adequately supports the prosecution's honest services theory. The case was submitted to the jury on two alternative, legally valid theories. If either theory was supported by sufficient evidence, we are bound to affirm. *Griffin*, 502 U.S. at 56-60, 112 S.Ct. at 472-74, *cited in United States v. Fisher*, 22 F.3d 574, 576 (5th Cir. 1994). As we discuss in the next section, the evidence was sufficient to support appellants' convictions on the theory that they schemed to obtain money or property through false means.

### III. *Sufficiency of the Evidence*

All three appellants claim, on numerous grounds, that the evidence was insufficient to support their convictions. Having reviewed all of appellants' insufficiency claims, we will discuss only the least implausible; all are unpersuasive.

### A. *Count One: Conspiracy (Appellants Manges and Myers)*[6]

### 1. *Common Scheme*

Appellants claim that there was no proof of the "essential nature" of the alleged conspiracy. *Cf. United States v. Rosenblatt*, 554 F.2d 36, 42 (2d Cir. 1977) (dismissing the indictment for lack of proof that the defendants conspired to commit the same fraud). They assert that the evidence was insufficient to show a coherent scheme to retain the lease to tract 350, particularly in light of the inconsistent stories they told state officials to explain the tract's failure to produce.

---

[6]In light of our resolution of Shanklin's statute of limitations argument, we need not address his claim that the evidence was insufficient to support his conspiracy conviction.

16

The fact that the conspirators changed their account in the face of official skepticism does not negate the existence of a conspiracy.  The government's explanation makes more sense.  The prosecution posited a conspiracy aimed at concealing appellants' failure to fulfill the conditions of their lease:

> Each co-conspirator had a role.  McLester (who pleaded guilty) furnished phony reports of production.  Myers encouraged McLester's falsities, and was instrumental in giving an aura of propriety to false documents that helped convince GLO that the lease terms had been satisfied.  Shanklin contributed to Myers' deceit by preparing bogus reports and invoices reflecting work done on State Tract 350 in intervals of less than 60 days. . . . [A]nd Manges distributed the funds to help the co-conspirators.

On the evidence, a rational jury could have found beyond a reasonable doubt that the appellants were engaged in a scheme to retain the lease by fraudulent means.

## 2.    *Intent:  Foreseeability of the Use of the Mails*

Conspiracy to commit mail fraud requires at least the level of intent necessary for mail fraud itself. *United States v. Sneed*, 63 F.3d 381, 385 (5th Cir. 1995) (internal citations omitted), *cert. denied*, ---U.S.---, 116 S.Ct. 712, 133 L.Ed.2d 667 (1996). However, there is no specific intent requirement with respect to the mailing element of mail fraud. *United States v. Massey*, 827 F.2d 995, 1002 (5th Cir. 1987).  The test is one of reasonable foreseeability:  the prosecution need only prove that the defendants "engaged in a scheme to defraud in which they contemplated that the mails would likely be used." *Id.*

The mailing at issue is the September 19, 1989, letter from the GLO to Redfish Bay Operating Co., stating that the lease to

17

tract 350 had been maintained.  As the government points out, the object of the conspiracy was to obtain a clean bill of health for tract 350.  The GLO was in Austin; Myers and Jaffe were based in San Antonio, 75 miles away.  The letter's author, Pittman, testified that the GLO routinely transacted business by mail.

Appellants contend that this evidence is not enough.  They argue that since none of them was employed by the land office, they could not have known that the GLO routinely transacted business through the mail.  They also claim that the distance between Austin and San Antonio does not support the conclusion that the use of the mails was foreseeable, especially in light of their own habits of delivering documents by hand and traveling to Austin to do business with the GLO.

Even if appellants' argument were not implausible on its face, the only precedent they cite in its behalf is the first panel opinion in *Brumley*.  *See United States v. Brumley (Brumley I)*, 59 F.3d 517, 520-22 (5th Cir. 1995), *opinion withdrawn and superseded on reh'g*, 79 F.3d 1430, 1432 (5th Cir. 1996)*, opinion vacated and reh'g en banc granted*, 91 F.3d 676 (5th Cir. 1996).  Appellants insist that the first Brumley opinion is still good law.  They are mistaken.[7]  *See* 5TH CIR. R. 41.3; *United States v. Pineda-Ortuno*, 952

---

[7]In any event, the cases are easily distinguishable.  *Brumley* involved wire transfers of money from Lufkin, Texas, to Beaumont, Texas.  The panel found it unforeseeable to the defendant that these transfers would be relayed through a Western Union computer in Missouri.  Absent a foreseeable interstate wire transmission, the panel found that Brumley's wire fraud conviction could not stand.  Here, in contrast, all that is required is a foreseeable use of the mail.  *Compare* 18 U.S.C. § 1341 (mail fraud) *with* 18 U.S.C. § 1343 (wire fraud).

18

F.2d 98, 102 (5th Cir. 1992) (once rehearing *en banc* is granted, "panel decision is vacated and of no precedential value").

We conclude that the jury could have found beyond a reasonable doubt that use of the mail was reasonably foreseeable to appellants.

**B.    *Count Two:   Mail Fraud (Myers and Shanklin)***

**1.    *False and Fraudulent Reports***

Count Two is based in part on evidence that appellants submitted false production reports, shut-in affidavits, and morning field reports.  Appellants contend that even if these documents were false, they could not have been fraudulent because they were not false with respect to "material matters."  They rely on the Supreme Court's observation that to be "material," a statement must tend naturally "to influence, or [be] capable of influencing, the decision of the decisionmaking body to which it is addressed." *United States v. Gaudin*, 115 S.Ct. 2310, 2313, 132 L.Ed.2d 444 (1995) (internal citation and quotation marks omitted).

Assuming that materiality is an element of the mail fraud charged, it was satisfied in this case.  It is self-evident that documents falsely informing the GLO that tract 350 had produced oil, or had been reworked at timely intervals, would tend to influence the GLO's decision regarding the status of the lease.

Appellants insist that their statements were immaterial because the amount of oil production falsely claimed was inadequate to maintain the lease.  In essence, they claim that their lies were not big enough.  They also claim that the lease had lapsed before

19

the false documents were submitted. These arguments are belied by the GLO letter itself; the jury could have rationally concluded that appellants' false statements influenced, or had a natural tendency to influence, the GLO's determination that the lease had been maintained.

## 2. *Mailing in Furtherance*

Myers and Shanklin claim that the evidence was insufficient to prove that either of them caused a mailing in furtherance of a scheme to defraud. A defendant "causes" the mails to be used if he "does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended . . . ." *Sneed*, 63 F.3d at 385 n.4 (quoting *Pereira v. United States*, 347 U.S. 1, 8-9, 74 S.Ct. 358, 363, 98 L.Ed. 435 (1954)).

We find that the jury could rationally have concluded that Myers was the driving force behind the effort to retain the lease on tract 350; that he submitted a false affidavit to the GLO in a plot to obtain written confirmation that the lease was still good; and that Shanklin prepared false field reports to support Myers' affidavits. It is reasonable to infer that the GLO would not have mailed the confirmation letter of September 19, 1989, but for appellants' submission of these false documents. The GLO mailing was reasonably foreseeable; indeed, it was a desired result of appellants' efforts.

## IV. *Motion to Sever*

Each appellant claims that the district court committed

20

reversible error by refusing to try him individually. *See* FED. R. CRIM. P. 14. We disagree.

As a rule, defendants indicted together should be tried together, particularly when they are charged in a common conspiracy. *Zafiro v. United States*, 506 U.S. 534, 537, 113 S.Ct. 933, 937, 122 L.Ed.2d 317 (1993); *United States v. Stotts*, 792 F.2d 1318, 1321 (5th Cir. 1986); *United States v. McCord*, 33 F.3d 1434, 1451-52 (5th Cir. 1994), *cert. denied*, ---U.S.---, 115 S.Ct. 2558, 132 L.Ed.2d 812 (1995). Joint trials are not only more efficient than separate trials but also more just, for they tend to avert "the scandal and inequity of inconsistent verdicts." *Zafiro*, 534 U.S. at 537, 113 S.Ct. at 937.

Where joinder is initially proper, we review the district court's refusal to sever for abuse of discretion. *See* FED. R. CRIM. P. 8(b); *McCord*, 33 F.3d at 1452 (quoting *United States v. Faulkner*, 17 F.3d 745, 758 (5th Cir.), *cert. denied*, 115 S.Ct. 193, 130 L.Ed.2d 125 (1994)). To prevail, an appellant must show that:

> (1) the joint trial prejudiced him to such an extent that the district court could not provide adequate protection; and (2) the prejudice outweighed the government's interest in economy of judicial administration.

*McCord*, 33 F.3d at 1452 (quoting *United States v. DeVarona*, 872 F.2d 114, 120-21 (5th Cir. 1989)).

Appellants' claims of prejudice rest in part on the faulty assumption that no conspiracy existed, or that none was proven. From that premise, each appellant complains that his trial was polluted with evidence of his co-defendants' misdeeds. Separate trials would have obviated this taint. Of course, we already have

21

determined that the evidence supported the jury's determination that a conspiracy existed. While the district court must guard against undue prejudice, it need not protect conspirators from evidence of their confederates' acts in furtherance of their common illegal aims.

Nevertheless, appellants raise several related contentions which do not rest entirely on their refusal to believe that the evidence of a conspiracy was sufficient. We address these claims in turn.

### A. *Shanklin and Myers*

Shanklin and Myers complain that they were prejudiced by the evidence of Manges' cash payments to Jack Giberson. They assert, "No limiting instruction would suffice to cure such prejudice." We disagree. The district court specifically instructed the jury to reach separate decisions on the guilt or innocence of each defendant, based on the evidence with respect to that defendant alone.[8] Cautionary instructions of precisely this sort have been held "sufficient to cure any possibility of prejudice." *McCord*, 33 F.3d at 1452 (quoting *Faulkner*, 17 F.3d at 759).

Shanklin and Myers further claim that Manges was "very unpopular" in San Antonio, where the trial was held. But there is

---

[8]The district court instructed the jury:
[T]he case of each defendant should be considered separately and individually. The fact that you may find one or more of the accused guilty or not guilty of any of the crimes charged should not control your verdict as to any other crime or any other defendant. You must give separate consideration to the evidence as to each defendant.

22

no hint in the record that Manges' reputation in the community resulted in any prejudice to his co-defendants. Shanklin and Myers derive this argument from the transcript of *voir dire*, in which several potential jurors admitting having formed unfavorable impressions of Manges. Having scoured the record, we are satisfied that the district court removed any potential jurors whose negative impressions of Manges might have colored their consideration of the evidence.[9]

Shanklin also claims that he was prejudiced by being tried jointly with Myers, whose role in the scheme was far greater than his own. We have observed repeatedly that "a quantitative disparity in the evidence is clearly insufficient in itself to justify severance." *United States v. Pettigrew*, 77 F.3d 1500 (5th Cir. 1996) (internal quotation marks omitted). *See also United States v. Rocha*, 916 F.2d 219, 228 (5th Cir. 1990), cert. denied, 500 U.S. 934, 111 S.Ct. 2057, 114 L.Ed.2d 462 (1991).

The district court, through attentive management of *voir dire* and appropriate cautionary instructions to the jury, minimized any risk of undue prejudice to Shanklin and Myers. Shanklin and Myers have failed to show that they were prejudiced "to such an extent that the district court could not provide adequate protection."

---

[9]*See United States v. Harrelson*, 754 F.2d 1153, 1175 (5th Cir. 1985) (denying one defendant's claim of prejudice based on her co-defendant's loathsome reputation as a hired killer), *cert. denied*, 474 U.S. 908, 106 S.Ct. 277, 88 L.Ed.2d 241 (1985). Appellants' claim is particularly unpersuasive because Myers chose to do business with Manges, and Shanklin opted to falsify documents in Myers' behalf. As we observed in *Harrelson*, "the circumstance that one has chosen odious associates seems a dubious sword." *Id.*

23

*McCord*, 33 F.3d at 1452 (citation omitted).[10]

**B.    *Manges***

Manges claims that he was prejudiced in several ways by the district court's refusal to grant a severance.  First, Manges claims that he was denied the exculpatory testimony of Shanklin and Myers because, as co-defendants, they exercised their Fifth Amendment right not to testify.  We do not agree.

Shanklin's pre-trial offer to testify on Manges' behalf was conditioned upon a demand that he be tried first, and thus was not unequivocal, as required by the fourth prong of the *Broussard* test. *See United States v. Broussard*, 80 F.3d 1025, 1037 (5th Cir.) (to establish prejudice from joint trial, defendant must show that co-defendant would in fact testify if severance were granted), *cert. denied*, ---U.S.---, 117 S.Ct. 264, 136 L.Ed.2d 189 (1996).[11]

Second, Manges complains that the denial of his severance

---

[10]Shanklin and Myers also claim that they suffered "prejudicial spillover" from the use of the Addington tapes as evidence against Manges on the dismissed bribery count.  We reject this argument. The jury was specifically instructed not to consider the tapes as evidence against Shanklin and Myers.  We have held that "the pernicious effect [of spillover] . . . is best avoided by precise instructions to the jury on the admissibility and proper uses of the evidence introduced by the Government."  *Harrelson*, 754 F.2d at 1175 (internal citation and quotation marks omitted).

[11]On the last day of trial, outside the jury's presence, Manges proposed to call both Myers and Shanklin as witnesses.  They indicated that if called, they would invoke their right not testify.  The district court consequently refused to call them and denied Manges' renewed motion for severance.  This was not an abuse of discretion.  "[T]he district court must balance any prejudice to the defendant against the court's interest in judicial economy." *United States v. Lopez*, 979 F.2d 1024, 1035 (5th Cir. 1992) (citation omitted), *cert. denied*, 508 U.S. 913, 113 S.Ct. 2349, 124 L.Ed.2d 258 (1993).  Given the late hour, the inefficiency would have been extreme; the testimony's value was uncertain.

motion exposed the jury to prejudicial testimony that McLester had pleaded guilty in the alleged conspiracy.  Counsel for Myers had indicated that he would seek to impeach McLester's credibility by eliciting the fact that he had pleaded guilty and was awaiting sentencing.  The prosecution thus was allowed to elicit the information first.  Manges contends that at a separate trial, he would not have proffered evidence of McLester's plea, and that consequently the prosecution would have been barred from doing so.

Although evidence of a co-conspirator's conviction is inadmissable as substantive proof of a defendant's guilt, it is "admissible and commonly used for impeachment purposes." *United States v. Leach*, 918 F.2d 464, 467 & n.4 (5th Cir. 1990) (citations omitted), *cert. denied*, 501 U.S. 1207, 111 S.Ct. 2802, 115 L.Ed.2d 976 (1991).  *Leach* recognized that the prosecution may elicit evidence of a co-conspirator's conviction to "blunt[] the sword of anticipated impeachment by revealing the information first." *Id.* at 467 (internal citation and quotation marks omitted).  *See also United States v. Valley*, 928 F.2d 130, 133 (5th Cir. 1991).  In this case, the district court cautioned the jury that the fact that McLester had pleaded guilty related solely to his credibility, and was not proof of any other defendant's guilt.  The court did not abuse its discretion by giving this instruction instead of granting the more extreme remedy of severance.

We have reviewed Manges' remaining contentions with respect to his severance motion.  We find them wholly meritless.

V.  *Jury Instructions*

Appellants contend that reversal is warranted because the district court erred in instructing the jury. We review objected-to jury instructions for abuse of discretion, affording the district court "substantial latitude" to fashion its charge. *United States v. Gray*, 96 F.3d 769, 775 (5th Cir. 1996), *cert. denied*, ---U.S.---, ---S.Ct.----, 1997 WL 70921 (Mar. 17, 1997) (No. 96-7763); *United States v. Storm*, 36 F.3d 1289, 1294 (5th Cir. 1994), *cert. denied*, ---U.S.---, 115 S.Ct. 1798, 131 L.Ed.2d 725 (1995). In the absence of a proper objection, we review for plain error. *See* FED. R. CRIM. P. 30, 52(b); *Gray*, 96 F.3d at 775.

### A. *Constructive Amendment of the Indictment*

Appellants argue that by mishandling the jury charge, the district court constructively amended the indictment, in violation of their rights under the Fifth and Sixth Amendments. *See generally United States v. Holley*, 23 F.3d 902, 912 (5th Cir.) (defining constructive amendment) (citations omitted), *cert. denied*, ---U.S.---, 115 S.Ct. 635, 130 L.Ed.2d 542 (1994); *United States v. Arlen*, 947 F.2d 139, 144 (5th Cir. 1991) (citation omitted), *cert. denied*, 503 U.S. 939, 112 S.Ct. 1480, 117 L.Ed.2d 623 (1992).

This argument rests on the assertion that despite the dismissal of the bribery count against Manges, the jury charge contained "language tracking the elements" of bribery, as defined in 18 U.S.C. § 666. This assertion is entirely unsupported by the record. In reality, the district court omitted any reference to the bribery statute. The court simply permitted the jury to

consider two alleged cash payments to Jack Giberson as overt acts in furtherance of the conspiracy. Contrary to appellants' contentions, the district court did not "broaden[] the possible bases for conviction from [those] which appeared in the indictment." *United States v. Miller*, 471 U.S. 130, 138, 105 S.Ct. 1811, 1816, 85 L.Ed.2d 99 (1985) (emphasis omitted). Accordingly, there was no constructive amendment.

## B. *Dismissal of the Bribery Count*

Appellants also argue that the dismissal of the substantive bribery count renders their conspiracy convictions infirm. They reason that the jury may have convicted them of either conspiracy to commit mail fraud or conspiracy to commit bribery. They assert that a conspiracy conviction premised on the target offense of bribery would be "improper" in light of Manges' acquittal "on the facts and law of the substantive offense of bribery under § 666."

This argument is doubly flawed. First, the jury could not possibly have convicted appellants of conspiracy to commit bribery. The district court carefully instructed the jury to consider only two offenses: mail fraud, and conspiracy to commit mail fraud. It is immaterial that one object of the alleged scheme, to deprive Texas citizens of their right to honest government services, bears a passing resemblance to bribery. Second, appellants are grievously misinformed if they believe that they cannot properly be convicted of conspiracy once they or their co-defendant has been acquitted of a related substantive offense. To be convicted of conspiracy, defendants "need not . . . have committed the crime

27

that was its object." *United States v. Duvall*, 846 F.2d 966, 975 (5th Cir. 1988) (citing *Braverman v. United States*, 317 U.S. 49, 53, 63 S.Ct. 99, 101, 87 L.Ed. 23 (1942)).

The district court held the evidence insufficient to submit the bribery count against Manges to the jury. This holding does not provide Manges and his co-defendants an avenue of escape from criminal liability for the distinct offense of conspiracy.

## C.    *Good Faith Instruction*

Shanklin claims that the district court erred by refusing to instruct the jury that good faith is a defense. The government argues--and Shanklin does not dispute--that the plain error standard applies because of Shanklin's failure to object as required by FED. R. CRIM. P. 30. *See United States v. Adkins*, 741 F.2d 744, 748 (5th Cir. 1984), *cert. denied*, 471 U.S. 1053, 105 S.Ct. 2113, 85 L.Ed.2d 478 (1985) (applying plain error standard to jury instructions when requirements of Rule 30 are not met).

The district court admonished the jury that before convicting any defendant, it must find that he acted "knowingly" and "willfully." The court defined both these concepts in terms of intent.[12] The jury that convicted Shanklin of mail fraud thus could not have believed that he participated in the scheme without the requisite criminal intent, *i.e.*, in good faith. There was no need

---

[12]Specifically, the court defined "knowingly" to mean "voluntarily and intentionally and not because of a mistake or [accident]." The court defined "willfully" to mean "voluntarily and purposely with the specific intent to do something the law forbids. That is to say, with bad purpose either to disobey or disregard the law."

28

for a good-faith instruction, and consequently no error, plain or otherwise. *Storm*, 36 F.3d at 1294.

### D. *Supplemental* Pinkerton *Instruction*

At the conclusion of closing arguments, the district court supplemented its jury charge with an instruction on co-conspirator liability. *See Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). Myers and Shanklin appeal their mail fraud convictions on the ground that this supplemental charge departed from the procedures prescribed in FED. R. CRIM. P. 30. Specifically, they argue that the post-argument instruction allowed the jury to consider a theory of criminal liability that defense counsel had no opportunity to rebut. According to appellants, the instruction thus deprived counsel of the opportunity to "intelligently argue the case to the jury." *Cf. United States v. Mendoza*, 473 F.2d 697 (5th Cir. 1973).

Appellants should have requested an opportunity to supplement their closing arguments in the district court. They did not. Appellants cannot claim that they were shortchanged an opportunity to argue the *Pinkerton* issue when they never requested one.

The remaining challenges to appellants' convictions do not merit discussion. We next turn to their sentences.

### VI. *Sentencing*

Appellants claim that the district court sentenced them under the wrong section of the United States Sentencing Guidelines and compounded its error by improperly enhancing their offense levels. We reject these arguments for the reasons that follow.

29

The applicable sentence range under the guidelines is based on two variables: the offense level, which reflects the gravity of the crime, and the defendant's criminal history. *See* U.S. SENTENCING GUIDELINES MANUAL, Ch. 5, Pt. A (Sentencing Table) (1994). The guidelines provide that the base offense level for conspiracy in violation of 18 U.S.C. § 371 is the same as the base offense level for the substantive offense that was the conspiracy's object. U.S.S.G. § 2X1.1(a). Applying this section, the district court assigned each appellant a base offense level of 10 pursuant to U.S.S.G. § 2C1.7, which governs frauds that deprive the public of its intangible right to the honest services of government officials.[13] The district court then increased each appellant's offense level by 8, reflecting the court's finding that the fraud "involved[] giving a thing of value to a high level employee of the General Land Office . . . ." U.S.S.G. § 2C1.7(b)(1)(B).[14] Based on appellants' total offense level of 18 and their insignificant

---

[13]Each appellant was assigned the same offense level whether he was convicted of one count or two. In sentencing Myers and Shanklin, the district court grouped the conspiracy and mail fraud counts as components of a common criminal scheme or plan. *See* U.S.S.G. § 3D1.2(b). Consequently, neither Myers nor Shanklin suffered an incremental increase in punishment as a result of his second conviction. *See* U.S.S.G. § 3D1.3(a). Conversely, our reversal of Shanklin's conspiracy conviction does not require resentencing on his mail fraud conviction; he would have received the same offense level had he been convicted of mail fraud alone.

[14]The pertinent subsection states:
If the offense involved an elected official or any official holding a high-level decision-making or sensitive position, increase by **8** levels.
U.S.S.G. § 2C1.7(b)(1)(B).

criminal records,[15] they were subject to a sentence range of 27 to 33 months.  U.S.S.G., Ch. 5, Pt. A (Sentencing Table).

The court sentenced Manges to 27 months in prison for conspiracy.  Myers was sentenced to concurrent 30-month prison terms for conspiracy and mail fraud.  Shanklin was sentenced to concurrent 8-month terms for conspiracy and mail fraud; the district court held that his minor role in the offense justified a downward departure from the applicable sentence range.

These sentences must be upheld unless they were imposed in violation of law, resulted from an incorrect application of the guidelines, or departed unreasonably from the applicable sentence range.  *United States v. Underwood*, 61 F.3d 306, 308 (5th Cir. 1995) (citing *United States v. Matovsky*, 935 F.2d 719, 721 (5th Cir. 1991) (citing 18 U.S.C. § 3742(e))).  We review the district court's interpretation of the guidelines *de novo* and its underlying factual findings for clear error.  *Id.* (citing *United States v. Brown*, 7 F.3d 1155, 1159 (5th Cir. 1993)).

Appellants claim that the district court erred by sentencing them as if they had been convicted of conspiring to commit a fraud involving public corruption.  In their view, because no one can tell whether the jury adopted the honest services theory, they should have been sentenced under the less onerous guideline for conspiring to defraud another of money or property.  *See* U.S.S.G.

---

[15]Myers and Shanklin had no prior convictions.  Manges was convicted of making false statements to the Small Business Administration with respect to an equipment purchase in 1959.  The district court did not assign Manges any criminal history points based on this offense.  *See generally* U.S.S.G., Ch. 4, Pt. A.

§ 2F1.1 (base offense level of 6).

Appellants recognize that the guidelines empower the district court to sentence them for the more serious of the two charged conspiracies, provided that the district court itself would have convicted them on that basis. The guidelines provide that a defendant convicted of a multiple-object conspiracy count should be sentenced "as if the defendant had been convicted of a separate count of conspiracy for each offense that the defendant conspired to commit." U.S.S.G. § 1B1.2(d). These hypothetical conspiracy convictions should be grouped according to Chapter 3, Part D of the guidelines, which governs multiple counts of conviction. *Id.*, commentary, note 4; *see also United States v. Fisher*, 22 F.3d 574, 576 (5th Cir. 1994). When multiple counts result from a common scheme, they are deemed a single group and are assigned the offense level for the most serious offense in the group. *Fisher*, 22 F.3d at 576.

However, the operation of Section 1B1.2(d) is restricted by its commentary, which cautions:

> Particular care must be taken in applying subsection (d) because there are cases in which the verdict or plea does not establish which offense(s) was the subject of the conspiracy. In such cases, subsection (d) should only be applied with respect to an object offense alleged in the conspiracy count if the court, were it sitting as a trier of fact, would convict the defendant of conspiring to commit that object offense.

U.S.S.G. § 1B1.2(d), commentary, note 5. The district court's determination of the conspiracy's object offense "should be governed by a reasonable doubt standard." *Fisher*, 22 F.3d at 577 (quoting U.S.S.G., app. C., amend. 75 (Nov. 1, 1989)).

The district court did not state whether it had concluded beyond a reasonable doubt that appellants were guilty of conspiring to commit mail fraud on the honest services theory. Nevertheless, we believe that such a finding is implicit in the district court record. We have held that findings under Section 1B1.2(d) and note 5 may be either express or implied. *See id.* at 576 (5th Cir. 1994) (citing *United State v. McKinley*, 995 F.2d 1020 (11th Cir. 1993), *cert. denied*, --- U.S. ---, 114 S.Ct. 1405, 128 L.Ed.2d 77 (1994)). In the instant case, the district court held that the offense "involved[] giving a thing of value to a high level employee of the General Land Office . . . ." This finding is clear evidence that in the view of the district court, the conspiracy at issue involved a deprivation of the public's right to the honest services of a state government official. Frauds involving high-level public officials are a subset of frauds involving public officials; the district court's finding in support of the 8-level enhancement thus presupposes that appellants were guilty of conspiring to commit a public corruption fraud.[16]

Finally, appellants claim that even if Section 2C1.7 applies, the district court erred by enhancing their offense level based on

---

[16]Appellants also claim that Section 1B1.2(d) and its commentary are unconstitutional because they empower the district court to usurp the jury's fact-finding role. *See* U.S. CONST. amend. VI. We disagree, essentially for the reasons stated in *United States v. Conley*, 92 F.3d 157 (3d Cir. 1996). "[T]here is no Sixth Amendment right to jury sentencing, even where the sentence turns on specific findings of fact." *Id.* at 166 (quoting *McMillan v. Pennsylvania*, 477 U.S. 79, 92, 106 S.Ct. 2411, 2419, 91 L.Ed.2d 67 (1986) (internal citation omitted)). *But see United States v. Bush*, 70 F.3d 557 (10th Cir. 1995) (procedure authorized by Section 1B1.2(d) & note 5 violates Fifth and Sixth Amendments) (*dicta*).

the involvement of a high-level public official. U.S.S.G. § 2C1.7(b)(1)(B). This argument rests on appellants' contentions that the official, Jack Giberson, never retained any money in connection with the oil lease and never exercised his authority to benefit appellants' interests. This argument is untenable; the guidelines do not require proof that Giberson kept the money or wielded his influence corruptly. Enhancement is appropriate if the offense "involved . . . any official holding a high-level decision-making or sensitive position . . . ." U.S.S.G. § 2C1.7(b)(1)(B). It is undisputed that Giberson was a high-level decision-making official, and the district court expressly found that the scheme "involved" him. This finding is not clearly erroneous.

## CONCLUSION

The judgment is REVERSED with respect to appellant Shanklin's conspiracy conviction, and count one against him is hereby DISMISSED. The judgment of the district court as to appellants' convictions and sentences is in all other respects AFFIRMED.

34